UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| VISIONQUEST NATIONAL, LTD., | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| -against – | : | NO._____ |
| | : | |
| CITY OF PHILADELPHIA | : | Jury Trial |
| and PHILADELPHIA ZONING | : | |
| BOARD OF ADJUSTMENTS, | : | |
| Defendants. | : | |

## VERIFIED COMPLAINT

Plaintiff VisionQuest National, Ltd. ("Plaintiff" or "VisionQuest") by and through its undersigned counsel, brings this damages and injunctive relief action under Title 42, United States Code, Section 1983, relating to the arbitrary and discriminatory practices engaged in by defendants City of Philadelphia ("the City") and the Philadelphia Zoning Board of Adjustment relating to its attempts to prevent 60 primarily Hispanic child refugees ("Child Refugees") from moving into a safe, habitable and professionally-staffed facility operated by Plaintiff on Old York Road in Philadelphia, Pennsylvania ("the Facility"). Despite the fact that this Facility is already zoned for Group Living, and has been previously used as a home for children, the City has refused to permit the federal Office of Refugee Resettlement ("ORR") to place these 60 children in the Facility pursuant to a contract between ORR and Plaintiff, based, at least in substantial part, on the fact that most of these Child Refugees are from Central America and are Hispanic.

{HL919276.1}

## THE PARTIES

1.      Plaintiff VisionQuest National Ltd. ("VisionQuest") is an Arizona corporation that provides shelter and support facilities for children. VisionQuest has a leasehold interest in the real property owned by OYR Realty Partners located at 5201 Old York Road, Philadelphia, PA 19141 ("the Property"). VisionQuest has contracted with the Department of Homeland Security's Office of Refugee Resettlement ("ORR") to provide temporary housing and services for Unaccompanied Alien Children ("UAC") at the Property.

2.      Defendant City of Philadelphia ("the City") is a municipal corporation chartered by the Commonwealth of Pennsylvania under the Act of April 21, 1949, P.L. 665, § 1, et seq.

3.      The Philadelphia Board of Zoning Adjustments is a division and instrumentality of the City of Philadelphia.

## JURISDICTION AND VENUE

4.      This Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331, in that Plaintiff brings this damages and injunctive relief action under 42 U.S.C. § 1983, relating to the arbitrary and discriminatory practices engaged in by defendants.

5.      This Court also has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 in that there is complete diversity of citizenship between the parties.

6.      Venue properly lies in this Judicial District pursuant to 28 U.S.C. §1391 (b)(2) in that a substantial part of the events or omissions giving rise to the claim occurred, and a substantial part of the property that is the subject of the action is situated in this District.

## STATEMENT OF FACTS

7.      For many years, the Property has been used as a residential facility for adolescents pursuant to a "Group Living" use designated by the Philadelphia Zoning Code ("the Code").

"Group Living" is defined under the Code as "Residential occupancy of a building or any portion thereof that is not categorized as a household living use … and that typically provides communal kitchen/dining facilities." Group Living facilities include "group homes" and "temporary overnight shelters." See, e.g., Code § 14-601(2)(b).

8.      Starting in 2010, Plaintiff operated the Facility pursuant to an Application for its use as a residential facility for a total of 145 residents between the ages of 13 and 18. Upon review and approval by the City's Department of Licenses and Inspections ("L&I"), the examiner added a handwritten note to the Application stating: "Residents not under the jurisdiction of any court per Tom Chapman, Esq. Blank Rome LLP." See **Exhibit A** attached hereto.

9.      Upon information and belief, in adding the "not under the jurisdiction of a court" language, the City examiner was indicating that the Property and the Facility would not be used as a "Private Penal and Correctional Institution" to house juvenile criminal offenders, as defined by the Philadelphia Zoning Code ("the Code").

10.      The Code defined "Private Penal and Correctional Institution" as follows: "An institution operated by a private party under contract with the City of Philadelphia, the Commonwealth of Pennsylvania or the federal government for the confinement of offenders sentenced by a court and still under the jurisdiction of a court." See Code at § 14-100(67A), prior version of which is attached as **Exhibit B**. This is essentially a *private* prison or halfway house, as contrasted with a "Public Penal and Correctional Institution," which the former Code defined as an "institution operated by the City of Philadelphia, the Commonwealth of Pennsylvania or the federal government for the confinement of offenders sentenced by a court and still under the jurisdiction of a court." Code at § 14-100(67B), attached at Ex. B.

11.     Thus, the language "under the jurisdiction of a court," understood in context, was clearly intended to denote a facility for the confinement of convicted criminals who had been sentenced by the criminal court and were still under its jurisdiction.

12.     Whether private or public, a "Penal and Correctional Institution" is a "Regulated Use" that, like adult book stores, adult film theaters and cabarets, is not permitted in certain areas of the City due to its perceived impact on the surrounding neighborhoods.

13.     In adding the phrase "not under the jurisdiction of a court" to the Application, the L&I examiner, upon information and belief, was ensuring that the Property would not be used as a "Penal and Correctional Institution" and therefore did not need registration as a "Regulated Use."

14.     Following the City agency's initial denial of the Application, on March 24, 2010, the City Zoning Board of Adjustment ("ZBA") granted use variance relief, and on March 26, 2010, the owner of the Property, OYR Realty Partners, LP ("OYR") obtained a use permit, stating in relevant part: "For the use of existing … Building for diagnostic, treatment, educational and residential facility for 145 residents between the ages of 13 and 18. Residents not under the jurisdiction of any court …." See Use Permit attached hereto as **Exhibit C**.

15.     Starting in 2010, the Property and the Facility were used as a "Group Living" facility for juveniles who were not juvenile criminal offenders.

16.     In or about October 2018, VisionQuest entered into a cooperative agreement ("the Contract") with ORR to provide services to 60 unaccompanied and undocumented minors under the jurisdiction of ORR. Under the Contract and as provided by statute, VisionQuest undertook to "provide residential shelter and services" for "unaccompanied children," or children who were under age 18 and who had no lawful immigration status in the United States or parent or legal

guardian in the United States to provide care and physical custody. *See* 6 U.S.C. § 279(g)(2)

(incorporated into the Immigration and Nationality Act as 8 U.S.C. § 1232(g)). The "residential

shelter and services" to be provided by VisionQuest include physical care and maintenance

(living accommodations, food, clothes, personal grooming items), medical and dental care,

individualized needs assessments, educational services and services to identify relatives and/or

potential legal guardians who may take physical custody of the unaccompanied child. *Id.*

17.     In furtherance of its obligations under the Contract, VisionQuest hired

approximately 70 staff members (including medical, educational and social services providers),

with plans to hire approximately 50 additional staff members when it is certain that the Child

Refugees will be permitted to move into the Property.

18.     Upon information and belief, under Pennsylvania law, VisionQuest's existing use

permit allows VisionQuest to operate the Facility to accommodate the 60 Child Refugees it has

contracted to care for under the Contract with ORR.

### The Unaccompanied Alien Children Program

19.     Every year, thousands of children enter the United States with no parent or legal

guardian. These children are designated as "Unaccompanied Alien Children" who cross the

border to escape violence and abuse or to join family members who have already entered the

United States. *See* "A Guide to Children Arriving at the Border: Laws, Policies and Responses,"

American Immigration Council Special Report (June 26, 2015) ("AIC Report"), attached hereto

as **Exhibit D**, at p. 2.

20.     When the entry of these Child Refugees peaked at 68,541 in 2014, then President

Barack Obama issued a Presidential Memorandum stating that the "influx of unaccompanied

alien children (UAC) across the southwest border of the United States has resulted in an urgent

humanitarian situation…." See "Unaccompanied Alien Children: An Overview," William A.

Kandel (Congressional Research Service, January 18, 2017) ("CRS Memo"), attached hereto as

**Exhibit E**.

21.     This national crisis is being predominantly handled by the United States

Department of Health and Human Services Office of Refugee Resettlement ("ORR"), a federal

agency that operates the Unaccompanied Alien Children Program ("UACP").

22.     The UACP was created in 2002, when Congress transferred the care and custody

of unaccompanied alien children from the Immigration and Naturalization Service ("INS") to

ORR in order "to move away from the adult detention mode." See ACF Fact Sheet (March

2019), attached hereto as **Exhibit F**.

23.     Pursuant to the Homeland Security Act of 2002 and the Trafficking Victims

Protection Reauthorization Act of 2008, the UACP is required to ensure that each child is

"promptly placed in the least restrictive setting that is in the best interest of the child, "develop a

plan to ensure the timely appointment of legal counsel," "ensure that the interests of the child are

considered in decisions and actions relating to [their] care and custody," and "screen each [child]

to determine if the child has been a victim of a severe form of trafficking in persons, if there is

credible evidence that the child would be at risk if he or she were returned to his/her country of

nationality or last habitual residence, and if the child has any possible claim to asylum." See CRS

Memo, attached as Exhibit E, at p. 8.

24.     To comply with these mandates, "the majority of youth are cared for initially

through a network of state-licensed, ORR-funded care providers that offer classroom education,

mental and medical health services, case management, and socialization and recreation." *Id.*,

CRS Memo at 8. These facilities "facilitate the release of [children] to family members or other sponsors who are able to care for them." *Id.* Most of these children "are reunified with family members." *Id.* at p. 10.

25.     The process by which Child Refugees reach facilities such as that maintained by VisionQuest in Philadelphia is often a long and complicated one. Children immigrants are first sent to a "processing center," such as the largest one located in McAllen, Texas. Most recently, the McAllen processing center and others have been overwhelmed, leading to the establishment of temporary emergency centers established throughout the United States. See, *e.g.,* BuzzFeed News, March 30, 2019, "It's Hell There: This is What it's Like for Immigrants Being Held in a Pen Underneath an El Paso Bridge," attached hereto as **Exhibit G**. Those who have been detained in such facilities have reported that they have "endured cold and windy nights sleeping on bare, rocky dirt … [with] nothing but thin, mylar blankets." *Id.*

26.     United States immigration officials have admitted that "they have been overwhelmed by the influx of migrant families trying to enter the country, filling facilities to capacity, and forcing officials to temporarily house people [in facilities like the one under the El Paso bridge] as a transition shelter." *Id.*

27.     Due to the scarce supply of housing such as that provided by VisionQuest, the U.S. government has been forced to establish "emergency influx shelters" solely for children, such as to ones recently established in Homestead, Florida and Tornillo, Texas. See Congressional Testimony of UC Davis School of Law Professor J.J. Mulligan Sepulveda, February 27, 2019, attached hereto as **Exhibit H**.

28.     According to Professor Sepulveda, these emergency shelters for children house thousands of children at a time, including several hundred in the same room, which do not meet "standards [that] are the minimum necessary to provide a safe and healthy environment of children in the government's care." *Id.*

29.     By law, Unaccompanied Alien Children cannot be held in processing facilities like those in McAllen, El Paso, Homestead or Tornillo, Texas for more than 72 hours. See 8 U.S. C. § 1232(b)(3); see also NBC Report, attached hereto as **Exhibit I**. Nevertheless, because of the backlog at HHS centers for children, hundreds of minors are forced to stay past that limit. *Id.* In short, these facilities simply "are not prepared or qualified to deal with the challenges that come with caring for a child." *Id.*

30.     In 2018, the UACP processed 49,100 children, predominantly arriving from Guatemala, El Salvador and Honduras. However, there are only 100 UACP shelters nationwide, UAC Frequently Asked Questions, dated August 7, 2018 ("FAQ"), attached hereto as **Exhibit J**. Consequently, the existing shelters cannot accommodate the number of children at issue, forcing the children to either remain at emergency influx centers or to be released without supervision in the United States.

**The City Refuses to Permit VisionQuest to Provide Shelter to Child Refugees**

31.     VisionQuest is one of these ORR-funded care providers, meeting all of the requirements and standards set by ORR for its participating facilities. The VisionQuest Facility does not accept any criminal, violent or potentially dangerous juveniles, who must be housed in secure detention facilities, not facilities such as those maintained by VisionQuest.

32.     Nevertheless, in January 2019, when the City became aware of VisionQuest's intention to use the Property and Facility as temporary housing for "Unaccompanied Alien Children" who had no criminal charges pending against them, but who had crossed the U.S./Mexico border into the United States unaccompanied by a parent, relative or legal guardian, the City abruptly, arbitrarily and irrationally decided that the Property and Facility could not be used for this purpose despite the continued and undisputed permitted use for that purpose.

33.     In response to community opposition to the proposed VisionQuest housing of Child Refugees, the Philadelphia Board of License and Inspections ("L&I") visited the facility on January 22, 2019 and, the following day, on January 23, 2019, cited VisionQuest for alleged improper zoning by determining that a shelter providing services for Philadelphia youth was a different use than a shelter providing services for unaccompanied alien minor refugees and, therefore, required a new zoning permit. A copy of the Violation Notice is attached hereto as **Exhibit K**.

34.     VisionQuest disputed this violation and petitioned the Zoning Board of Adjustments ("ZBA") to overrule the L&I determination. See Application for Appeal, attached hereto as **Exhibit L**.

35.     On March 19, 2019, the ZBA heard VisionQuest's appeal. During the hearing, the City conceded, upon information and belief, that VisionQuest was not proposing to use the Property and Facility as a Detention and Correctional Facility since the refugee children were not being confined there as punishment, which is a necessary element for any finding under the Pennsylvania Code that any facility falls within the definition of the term "Detention and Correctional Facility" under Code § 14-601(4)(d), *i.e.*, an "institution … for the confinement and punishment and treatment or rehabilitation of offenders under the jurisdiction of the court."

36.     VisionQuest also prepared and submitted a "Program Description" to the City, emphasizing that its "Grace Dix Center" facility and program for Refugee Children was "not part of President Trump's current immigration program which separates immigrant children from their parents and puts them in detention centers when they arrive in America." See **Exhibit M** attached hereto.

37.     VisionQuest also prepared and submitted an economic impact study outlining the substantial economic benefit to the community and the local jobs to be created. See **Exhibit N** attached hereto.

38.     Nevertheless, on April 3, 2019, the Zoning Board arbitrarily, irrationally and without explanation rejected VisionQuest's appeal, merely stating that a new zoning permit was required. See "Notice of Decision," attached hereto as **Exhibit O**. This decision was issued despite the substantial and unchallenged case law that was presented in support of VisionQuest's position that a new zoning permit was not required.

39.     As a result, 60 beds at the Facility remain empty, and the 70 healthcare providers, educators, social workers and other employees who are specifically trained to help Child Refugees and unite them with either relatives or qualified guardians remain idle.

## COUNT ONE

### (Deprivation of Civil Rights pursuant to 42 U. S.C. §1983)

40.     Plaintiff repeats and reiterates each and every allegation of the foregoing paragraphs of this Complaint as though fully set forth herein.

41.     42 U.S.C. § 1983 prohibits "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States "under color of" state law.

42.     The Fourteenth Amendment of the U.S. Constitution provides that "no State shall 'deprive any person of life, liberty, or property, without due process of law."

43.     A municipal land use decision may deprive a plaintiff having a property interest of substantive due process. See, e.g., *DeBlasio v. Zoning Bd. Of Adjustment, Twp. Of W. Amwell,* 53 F. 3d 592, 600 (3d Cir.), cert. denied, 516 U.S. 937 (1995). Cases involving zoning decisions, building permits, or other governmental permission required for some intended use of land owned by the plaintiff "implicate the fundamental property interest in the ownership of land." *Cherry Hill Towers, LLC v. Twp. Of Cherry Hill,* 407 F. Supp. 2d 648, 654 (D.N.J. 2006), quoting DeBlasio, supra, 53 F. 3d at 600. "[O]wnership is a property interest worthy of substantive due process protection," and "where the governmental decision in question impinges upon a landowner's use and enjoyment of property, a land-owning plaintiff states a substantive due process claim where he or she alleges that the decision limiting the intended land use was arbitrarily or irrationally reached." *DeBlasio,* supra, 53 F. 3d at 600-01.

44.     In this case, VisionQuest had a protected leasehold property interest that was deprived by the arbitrary, capricious, and irrational decision to deny plaintiff the already permitted use of the property for the housing of juveniles that they were not sentenced criminal offenders under the jurisdiction of the criminal court system.

45.     The City's Zoning Board of Adjustment's (ZBA's) decision, made under color of law, in refusing to allow VisionQuest to fulfill the terms of its contract with ORR and to house 60 Child Refugees, was based, upon information and belief, on the impermissible and discriminatory purpose of excluding Latino children originating in Central America from obtaining temporary housing in the Facility within the City of Philadelphia.

46.     But for the impermissible and discriminatory purpose demonstrated by the ZBA members, the decision would have not been made to bar VisionQuest from using the Facility for the housing of these Refugee Children without requiring plaintiff to undergo a time-consuming and costly process of applying for a new permit.

47.     As a result of defendant's actions, VisionQuest has suffered monetary damages in an amount to be determined at trial, and the Refugee Children have suffered incalculable damages by being deprived of a safe and habitable living environment that the plaintiff was fully prepared to provide to them at the Facility.

**Demand for Jury Trial**

48.     Plaintiff demands a trial by jury on all issues so triable.

WHEREFORE, plaintiff respectfully requests the following relief:

a.   An award of damages against the defendants in an amount to be determined at trial;

b.   Injunctive relief requiring defendants to permit plaintiff to use its Facility for the housing of Refugee Children under its Contract with ORR as a permitted use under the existing use permit;

c.   An award of attorneys' fees and costs; and

d.   Such other and further relief as this Court deems just and proper.

Dated:  May 24, 2019

HYLAND LEVIN SHAPIRO LLP

By: _____

Peter J. Boyer, Esq. (Id. 25517)
Julie M. Murphy, Esq. (Id. 206265)
Hyland Levin Shapiro LLP

6000 Sagemore Drive, Suite 6301
Marlton, NJ 8053
(856) 355-2900
boyer@hylandlevin.com
murphy@hylandlevin.com

Of Counsel:

McCALLION & ASSOCIATES LLP

*/s/Kenneth F. McCallion*

_____

By: Kenneth F. McCallion
    James Burchetta, of counsel
    100 Park Avenue – 16th floor
    New York, New York 10017
    (646) 366-0884

*Motion for Admission Pro Hac Vice
Forthcoming*

## VERIFICATION

MARK CONTENTO, declares under penalties of perjury as follows:

1. I am the President of VisionQuest National Ltd., Plaintiff in the above-captioned

   matter.

2. I have reviewed the foregoing Complaint and find its contents to be true and correct,

   except for those portions asserted upon information and belief, and as to those

   paragraphs, I believe them to be true and correct.

Dated: Tucson, Arizona
       May 24, 2019

MARK CONTENTO

# EXHIBIT A

2:00     ·10790     1-27-10

## APPLICATION FOR ZONING / USE REGISTRATION PERMIT

*(For office use only)*
APPLICATION # 254790

ZONING CLASSIFICATION R4 / nona

PREVIOUS APPLICATION NO.

**CITY OF PHILADELPHIA**
**DEPARTMENT OF LICENSES AND INSPECTIONS**
**MUNICIPAL SERVICES BUILDING – CONCOURSE**
1401 JOHN F. KENNEDY BOULEVARD
PHILADELPHIA, PA 19102
For more information visit us at www.phila.gov

*(Applicant completes all information below. Print clearly and provide full details)*
**LOCATION OF PROPERTY (LEGAL ADDRESS)**
5201 Old York Road (through to 13th St. and Wagner St.)

| PROPERTY OWNER'S NAME | PROPERTY OWNER'S ADDRESS: |
|---|---|
| OYR Realty Partners | 101 N. Providence Road, PO Box 21463 |
| | Wallingford, PA 19086 |
| PHONE # 215-329-7433     FAX # 215-329-7434 | LICENSE #          E-MAIL: |

| APPLICANT: | ADDRESS: |
|---|---|
| Peter F. Kelsen, Esq. | Peter F. Kelsen, Esq. |
| | Blank Rome LLP |
| **FIRM/COMPANY:** | One Logan Square |
| Blank Rome LLP | Philadelphia, PA 19103-6998 |
| PHONE # 215-569-5655     FAX # 215-832-5655 | LICENSE # 083309   E-MAIL: kelsen@blankrome.com |
| | LAI Consult ID # AC2688033 |

RELATIONSHIP TO OWNER:   TENANT/LESSEE  x ATTORNEY   DESIGN PROFESSIONAL   CONTRACTOR   EXPEDITER

### TABULATION OF USES

| FLOOR/SPACE # | CURRENT USE OF BUILDING/SPACE | Last Previous Use | Date Last Used |
|---|---|---|---|
| | Vacant | Same | Same |
| | | | |
| | | | |

| FLOOR/SPACE # | PROPOSED USE OF BUILDING/SPACE |
|---|---|
| | Use of existing Robinson Building for diagnostic, treatment, education, recreational, and residential facility. Total number of |
| | residents: 145; all between the ages of 13 and 18. Continue all uses as previously approved in other buildings on-campus. |
| | Key plan of campus attached. |

### STORIES AND HEIGHTS FROM GROUND TO ROOF

| HEIGHT | EXISTING BUILDING | | | PROPOSED ADDITION / ALTERATION / NEW CONSTRUCTION | | |
|---|---|---|---|---|---|---|
| | FRONT | SIDE | REAR | FRONT | SIDE | REAR |
| IN FEET | 4 | 4 | 4 | | | |
| IN STORIES | | | | | | |

BRIEF DESCRIPTION OF WORK/CHANGE:   Use of existing Robinson Building for diagnostic, treatment, education, recreational, and residential

facility. Total number of residents: 145; all between the ages of 13 and 18. Continue all uses as previously approved in other buildings on-campus.

Residents NOT UNDER THE JURISDICTION OF ANY COURT PER Tom CHAPLIN, ESQ.

SEE BACK FOR ADDITIONAL INFO.     2FF  00     BLANK ROME LLP (TRACY)   12/30/09

(NM)  12/24/09

___ CONTINUED ON ADDITIONAL SHEET (ATTACHED)    X ACCELERATED REVIEW    CHECK/RECEIPT/ML O NO. 104357

IS THIS APPLICATION IN RESPONSE TO A VIOLATION? ☒ NO   ☐ YES          VIOLATION #: _____

All provisions of the Zoning code and other City ordinances will be complied with, whether specified herein or not. Plans approved by the Department form a part of this application. I hereby certify that the statements contained herein are true and correct to the best of my knowledge and belief. I further certify that I am authorized by the owner to make the foregoing application, and that, before I accept my permit for which this application is made, the owner shall be made aware of all conditions of the permit. I understand that if I knowingly make any false statement herein I am subject to such penalties as may be prescribed by law or ordinance.

APPLICANT'S SIGNATURE: By _____     DATE: 12 / 24 / 09
Peter F. Kelsen, Esq.

11609227.v1

## PRE-REQUISITE APPROVALS FOR:

**ADDRESS:**                                          **APPLICATION #:**

| ✓ IF REQ'D | AGENCY | INITIALS | DATE | REMARKS |
|---|---|---|---|---|
| | ART COMMISSION<br>13TH FLOOR – 1515 ARCH STREET | | | |
| | CITY PLANNING COMMISSION<br>13TH FLOOR – 1515 ARCH STREET | | | |
| | HISTORICAL COMMISSION | | | |
| | FAIRMOUNT PARK COMMISSION | | | |
| | STREETS DEPARTMENT<br>ROOM 940 – M.S.B. | | | |
| | WATER DEPARTMENT<br>2ND FLOOR – 1101 MARKET STREET | | | |

## EXAMINER'S APPROVAL (OFFICE USE ONLY)

PERMIT TO READ:

TOTAL UNITS NINE (9) for 145 residents. occupies SECOND,
third and FOURTH STORIES AND EACH UNIT HAS LIVING
AREA, CLASS AREA, OFFICE AREA, BATHS, DINING

FIRST FLOOR INCLUDES ACCESSORY USES AND EXCEEDS
25% GFA

_____

_____

**NOTICE OF REFUSAL DATE:**                          **NOTICE OF REFERRAL DATE:**

| ZBA CALENDAR NO. | GRANTED BY ZBA<br>☐ NO    ☐ YES<br>DATE | PROVISOS<br>☐ NO      ☐ YES | FEE ITEM | AMOUNT |
|---|---|---|---|---|
| | | | FILING FEE | |
| | | | RE-INSPECTION FEE | |
| VIOLATION FOR WORK/CHANGE WITHOUT A PERMIT? | | | ZONING FEE | |
| ☐ NO      ☐ YES (INSPECTION FEE MUST BE ADDED TO PERMIT FEE) | | | USE FEE | |
| VIOLATION # | | | TOTAL FEES | |

This is to certify that I have examined the within detailed statement, together with a copy of the plans relating thereto, and find the same to be in accordance with the provisions of the law relating to zoning in the City of Philadelphia, that the same has been approved and entered into the records of this Department.

**EXAMINER:** _____   **DATE APPROVED:** _____

| PERMIT # | DATE ISSUED: | CHECK # |
|---|---|---|

81.16 (Reverse) (Rev. 8/98)





# EXHIBIT B

(66)   *Party Wall.* A wall used or adapted for use in common, as part of 2 or more buildings on separate lots;

(67)   *Patio.* See "Deck/Patio," §14-102(24);

(67A)   Penal and Correctional Institution (private). An institution operated by a private party under contract with the City of Philadelphia, the Commonwealth of Pennsylvania or the federal government for the confinement of offenders sentenced by a court and still under the jurisdiction of a court;

(67B)   Penal and Correctional Institution (public). An institution operated by the City of Philadelphia, the Commonwealth of Pennsylvania or the federal government for the confinement of offenders sentenced by a court and still under the jurisdiction of a court;

(68)   *Performance Space.* Space within a lot or building which is open and available to the public and which is designed and intended to be used for live presentations of performing arts and/or public presentations, speeches, debates or discussions;

(68A)   *Personal Communications Systems or PCS.* Wireless telecommunications service providers that include voice, data and video which occupy approximately the 2 Gigahertz spectrum;

(69)   *Plaza.* Space which is designed and intended to be used by the public and which is open to the sky and directly accessible to the public street and/or public transit concourse;

(70)   *Pool Rooms.* An establishment which provides 2 or more tables for the playing of pool and/or billiards;

(71)   *Premises.* A lot including all buildings and structures erected thereon;

(72)   *Principal Building.* A building in which the primary use of the lot on which the building is located is conducted;

(73)   *Principal Use.* The main use and primary purpose of a lot or structure as distinguished from an accessory use;

(74)   *Public Meeting Space.* Space within a lot or building which is open and available to the public and which is designed and intended to be used for public meetings, presentations, speeches, debates and/or discussions;

(75)   *Public Room.* Public space which is totally within a building, but which allows for year-round, climate controlled use by the public and which has direct access to the public street, transit concourses and/or transit stations;

(76)   *Public Space.* Space within a lot or building which is open and available to the public and which is designed and intended to be used by the general public; such space may consist of open space, enclosed public space, public rooms, gardens and/or connector public space;

(77)   *Public Transit Concourse.* The network of interconnected spaces below the street level which provide ingress and egress to public transit and/or railway stations from street level and/or buildings;

# EXHIBIT C

| USE PERMIT | CITY OF PHILADELPHIA ~ DEPARTMENT OF LICENSES & INSPECTIONS 1401 JOHN F KENNEDY BLVD PHILADELPHIA, PA 19102-1667 | PERMIT NUMBER 254790 | |
|---|---|---|---|
| SUBJECT TO REVOCATION IF FULL INFORMATION IS MISREPRESENTED OR NOT PROVIDED | | FEE $125.00 | DATE 03/26/10 |

| LOCATION OF WORK: 05201   OLD YORK RD PHILADELPHIA, PA 19141-2900 ROBINSON BUILDING | ZONING CLASSIFICATION R-4 |
|---|---|

| OWNER OYR REALTY PARTNERS III L 101 N PROVIDENCE RD WALLINGFORD, PA 19086 | APPLICANT PETER F. KELSEN ONE LOGAN SQUARE PHILADELPHIA, PA 19103 | PLAN EXAMINER NAWAR MUHSIN ZONING BOARD OF ADJUSTMENT DECISION CALENDAR #   10790 DATE   03/24/10 |
|---|---|---|

**THIS PERMIT DOES NOT AUTHORIZE ANY CONSTRUCTION UNTIL RELATED CONSTRUCTION PERMITS ARE ISSUED**

UNDER REGULATIONS OF THE PHILADELPHIA ZONING ORDINANCE FOR

Use Registration

FOR THE USE OF EXISTING ROBINSON BUILDING FOR DIAGNOSTIC, TREATMENT, EDUCATIONAL AND RESIDENTIAL FACILITY FOR 145 RESIDENTS BETWEEN THE AGES OF 13 AND 18. RESIDENTS NOT UNDER THE JURISDICTION OF ANY COURT. TOTAL OF NINE (9) UNITS FOR 145 RESIDENTS ON THE SECOND, THIRD, AND FOURTH FLOORS. EACH UNIT HAS LIVING AREA, CLASS AREA, OFFICE AREA, BATHS, DINING. FIRST FLOOR INCLUDES ACCESSORY USES AND KITCHEN AND EXCEEDS 25% OF GFA. ALL IN THE ROBINSON BUILDING ON THE SAME LOT WITH OTHER STRUCTURES, PARKING AND ALL OTHER USES AS PREVIOUSLY APPROVED (SIZE AND LOCATION AS SHOWN IN THE APPLICATION). NO SIGNS THIS PERMIT.

SUBJECT TO THE FOLLOWING PROVISOS AS ESTABLISHED BY THE ZONING BOARD OF ADJUSTMENT:
NONE

**OFFICE COPY**

ANY PERSON AGGRIEVED BY THE ISSUANCE OF THIS PERMIT MAY APPEAL TO THE ZONING BOARD OF ADJUSTMENT (ZBA). FOR INSTRUCTIONS ON FILING AN APPEAL, PLEASE CONTACT THE ZBA AT 215-686-2429 OR 215-686-2430.

IT SHALL BE THE OWNER'S RESPONSIBILITY TO SECURE THE APPROVAL OF THE PHILADELPHIA HISTORICAL COMMISSION PRIOR TO ANY ALTERATION TO A HISTORIC PROPERTY.  TO CHECK THE HISTORIC STATUS OF A PROPERTY, CALL THE PHILADELPHIA HISTORICAL COMMISSION AT 215-686-7660.

FOR ESTABLISHMENTS THAT PREPARE AND SERVE FOOD: APPLICANTS MUST OBTAIN ALL NECESSARY APPROVALS FROM THE HEALTH DEPARTMENT. SEPARATE PLAN REVIEWS AND FEES MAY BE REQUIRED. CONTACT THE PHILADELPHIA DEPARTMENT OF PUBLIC HEALTH - ENVIRONMENTAL HEALTH SERVICES / OFFICE OF FOOD PROTECTION: 321 UNIVERSITY AVE. - 2ND Floor, PHILADELPHIA, PA  19104  TELEPHONE NUMBER: (215) 685-7495

LIMITATIONS:
IN CASES WHERE NO CONSTRUCTION OR INTERIOR ALTERATIONS ARE INVOLVED, THIS PERMIT BECOMES INVALID SHOULD THIS USE NOT START WITHIN THREE (3) MONTHS FROM THE DATE OF ISSUANCE.

IN CASE WHERE CONSTRUCTION OR INTERIOR ALTERATIONS ARE INVOLVED, A BUILDING PERMIT MUST BE OBTAINED WITHIN ONE (1) YEAR FROM THE DATE OF ISSUANCE OF THIS ZONING PERMIT OR NO LATER THAN TWO YEARS FROM THE ZONING BOARD OF ADJUSTMENT DECISION DATE.

THIS PERMIT DOES NOT CONSTITUTE APPROVAL FROM ANY STATE OR FEDERAL AGENCY, IF REQUIRED.

THIS PERMIT IS NOT A CERTIFICATE OF OCCUPANCY OR A LICENSE.

ALL PROVISIONS OF THE CODE AND OTHER CITY ORDINANCES MUST BE COMPLIED WITH, WHETHER SPECIFIED HEREIN OR NOT.
**POST A TRUE COPY OF THIS PERMIT IN A CONSPICUOUS LOCATION ON THE PREMISES**
POST WITH THE ASSOCIATED BUILDING PERMIT DURING THE CONSTRUCTION ACTIVITY.
WHEN NO CONSTRUCTION IS PROPOSED, POST FOR THE FIRST THIRTY (30) DAYS OF OCCUPANCY.

# EXHIBIT D



**American Immigration Council**
(https://www.americanimmigrationcouncil.org)

Home (/) » Research (/topics)

SPECIAL REPORT

# A Guide to Children Arriving at the Border: Laws, Policies and Responses

June 26, 2015                                                                    555

## Preface

The American Immigration Council is updating this Guide which was first issued in summer 2014. It provides information about the tens of thousands of children—some travelling with their parents and others alone—who have fled their homes in Central America and arrived at our southern border. This Guide seeks to explain the basics. Who are these children and why are they coming? What basic protections does the law afford them? What happens to the children once they are in U.S. custody? What have the U.S. and other governments done in response? What additional responses have advocates and legislators proposed? The answers to these questions are critical to assessing the U.S. government's responses and understanding the ongoing debate about whether reforms to the immigration laws and policies involving children are needed.

## Background: Who are the children, why are they coming, and what obligations do we have?

### What does "unaccompanied children" mean?

Children who arrive in the United States alone or who are required to appear in immigration court on their own often are referred to as unaccompanied children or unaccompanied minors. "Unaccompanied alien child" (UAC) is a technical term defined by law as a child who "(A) has no lawful immigration status in the United States; (B) has not attained 18 years of age; and (C) with respect to whom—(i) there is no parent or legal guardian in the United States; or (ii) no parent or legal guardian in the United States is available to provide care and physical custody." Due to their vulnerability, these young migrants receive certain protections under U.S. law. The immigration laws do not define the term "accompanied" children, but children arriving in the United States with a parent or guardian are considered accompanied.

### Where are these children and families coming from?

The vast majority of unaccompanied children and families arriving at the southwest border come from Mexico, Guatemala, Honduras, and El Salvador, although unaccompanied children may arrive from any country. Over the past few years, increasing numbers of children and families have been fleeing violence in Guatemala, Honduras, and El Salvador—a region of Central America known as the "Northern Triangle." According to U.S. Customs and Border Protection (CBP (http://www.cbp.gov/newsroom/stats/southwest-border-unaccompanied-children)), a component of the Department of Homeland Security (DHS), between October 1, 2013 and September 30, 2014, CBP encountered 67,339 unaccompanied children. The largest number of children (27 percent of the total) came from Honduras, followed by Guatemala (25 percent), El Salvador (24 percent), and Mexico (23 percent). The number of unaccompanied children arriving at the southern border has decreased since its peak in the summer and fall of 2014. Between October 1, 2014 and April 30, 2015, CBP apprehended 3,514 unaccompanied minors from El Salvador, 6,607 from Guatemala, 1,977 from Honduras, and 6,519 from Mexico. This represents approximately a 45 percent decrease from the same time period the prior year. The apprehensions of "family units" (children with a parent or legal guardian) also declined. There were 16,997 family unit apprehensions from October 1, 2014 to April 30, 2015, a 35 percent decrease from 26,341 apprehensions during the same time frame the year before. As discussed below, this decrease in apprehensions likely is tied to increases in apprehensions in Mexico and increased security measures along Mexico's southern border.

**Unaccompanied Migrant Children Encountered FY 2009-FY 2015\***



Source: CBP (http://www.cbp.gov/newsroom/stats/southwest-border-unaccompanied-children).
\*FY 2015 through April 30, 2015.

### Why are children and families leaving their home countries?

Researchers consistently cite increased Northern Triangle violence as the primary motivation for recent migration, while identifying additional causes including poverty and family reunification. A report by the Assessment Capacities Project (http://acaps.org/en/news/other-situations-of-violence-in-the-northern-triangle-of-central-america/1) (ACAPS), citing 2012 United Nations Office on Drugs and Crime (UNODC) data, highlighted that Honduras had a homicide rate of 90.4 per 100,000 people. El Salvador and Guatemala had homicide rates of 41.2 and 39.9, respectively. A 2014 analysis conducted by Tom Wong, a University of California-San Diego political science professor, took the UNDOC data and compared it to the data on unaccompanied children provided by CBP. Wong found a positive

relationship between violence and the flow of children: "meaning that higher rates of homicide in countries such as Honduras, El Salvador, and Guatemala are related to greater numbers of children fleeing to the United States."

While a child may have multiple reasons for leaving his or her country, children from the Northern Triangle consistently cite gang or cartel violence as a primary motivation for fleeing. Research conducted in El Salvador on child migrants who were returned from Mexico found that 60 percent listed crime, gang threats, and insecurity as a reason for leaving. In a United Nations High Commissioner for Refugees (UNHCR) survey of 404 unaccompanied children from El Salvador, Guatemala, Honduras, and Mexico, 48 percent of the children "shared experiences of how they had been personally affected by the...violence in the region by organized armed criminal actors, including drug cartels and gangs or by State actors." Furthermore, the violence frequently targets youth. Recruitment for gangs begins in adolescence—or younger—and there are incidents of youth being beaten by police who suspected them of gang membership.

### Are children coming to the United States because of DACA?

No. U.S. immigration enforcement policy, including deferred action programs that would allow certain undocumented immigrants to remain in the United States temporarily, is not a primary cause of the migration. Notably, the rise in violence and corresponding increase in unaccompanied child arrivals precede both the Deferred Action for Childhood Arrivals (DACA) program and Senate passage of an immigration reform bill S.744—positive developments that are sometimes cited as pull factors by Obama Administration critics. In fact, in its 2012 report, the Office of Refugee Resettlement (ORR) stated that "in a five month period between March and July 2012, the UAC program received almost 7,200 referrals – surpassing FY2011's total annual referrals," showing that the rise in UACs predated the implementation of the DACA program. Furthermore, individuals who arrived in the country after January 1, 2007 would not be eligible for DACA.

### Would more Border Patrol resources deter border crossers?

There is little evidence to support the proposition that the border must be further fortified to deter an influx of children and families. Treating the current situation as simply another wave of unauthorized immigration misses the broader policy and humanitarian concerns driving these children and families' migration. In fact, many women and children are turning themselves over to Border Patrol agents upon arrival and are not seeking to evade apprehension.

Furthermore, CBP's resources along the southwest border are already significant. There were 18,156 Border Patrol agents stationed along the southwest border as of Fiscal Year (FY) 2014. The annual Border Patrol budget stood at$3.6 billion (http://www.cbp.gov/sites/default/files/documents/BP%20Budget%20History%201990-2013.pdf) in FY 2014. The Border Patrol has at its command a wide array (http://www.isn.ethz.ch/Digital-Library/Publications/Detail/?lng=en&id=146454) of surveillance technologies: ground radar, cameras, motion detectors, thermal imaging sensors, stadium lighting, helicopters, and unmanned aerial vehicles.

### What are our obligations under international law?

The United States has entered into treaties (http://www.unhcr.org/pages/49da0e466.html) with other countries to ensure the protection and safe passage of refugees. Among the most important are the 1951 United Nations Convention Relating to the Status of Refugees and the 1967 Protocol. Under these treaties, the United States may not return an individual to a country where he or she faces persecution from a government or a group the government is unable or unwilling to control based on race, religion,

nationality, political opinion, or membership in a particular social group. A separate treaty, known as the Convention Against Torture (http://www.hrweb.org/legal/cat.html), prohibits the return of people to a country where there are substantial grounds to believe they may be tortured.

The United States has implemented these treaties in various laws and regulations. They form the basis for both our refugee program and asylum program. (An asylee is simply a refugee whose case is determined in the United States, rather than outside it.) In fact, under our laws, anyone in the United States may seek asylum, with some exceptions, or protection from torture with no exceptions. It can be difficult and complicated to determine whether an individual has a valid claim for asylum or protection from torture. To meet its protection obligations, the United States should ensure that children are safe, have an understanding of their situation and their rights, and have adequate representation when they tell their stories to a judge.

### Do Central American children qualify for protections under international and U.S. law?

Many of the children fleeing to the United States have international protection needs and could be eligible for humanitarian relief. According to UNHCR's survey (http://www.unhcrwashington.org/sites/default/files/1_UAC_Children%20on%20the%20Run_Full% 20Report.pdf) of 404 unaccompanied children from Mexico, El Salvador, Honduras, and Guatemala, 58 percent "were forcibly displaced because they suffered or faced harms that indicated a potential or actual need for international protection." Notably, of those surveyed, UNHCR thought 72 percent of the children from El Salvador, 57 percent from Honduras, and 38 percent from Guatemala could merit protection. While international protection standards are in some cases broader than current U.S. laws, the fact that over 50 percent of the children UNHCR surveyed might qualify as refugees suggests that a thorough and fair review of these children's claims is necessary to prevent them from being returned to danger.

Moreover, children may qualify for particular U.S. forms of humanitarian relief for victims of trafficking and crime, or for children who have been abused or abandoned by a parent. A 2010 survey conducted by the Vera Institute of Justice indicated that 40 percent of children screened while in government custody could be eligible for relief from removal under U.S. laws. Given their age, the complexity of their claims, and the trauma that generally accompanies their journey, determining whether these children qualify for some form of protection can be a time-consuming process.

### What types of U.S. immigration relief do children potentially qualify for?

The most common types of U.S. immigration relief for which children potentially are eligible include:

- **Asylum**: Asylum is a form of international protection granted to refugees who are present in the United States. In order to qualify for asylum, a person must demonstrate a well-founded fear of persecution based on one of five grounds: race, religion, nationality, political opinion, or membership in a particular social group.
- **Special Immigrant Juvenile Status** (SIJS): SIJS is a humanitarian form of relief available to noncitizen minors who were abused, neglected, or abandoned by one or both parents. To be eligible for SIJS, a child must be under 21, unmarried, and the subject of certain dependency orders issued by a juvenile court.
- **U visas**: A U visa is available to victims of certain crimes. To be eligible, the person must have suffered substantial physical or mental abuse and have cooperated with law enforcement in the investigation or prosecution of the crime.

- **T visas:** A T visa is available to individuals who have been victims of a severe form of trafficking. To be eligible, the person must demonstrate that he or she would suffer extreme hardship involving unusual or severe harm if removed from the United States.

## What is the Trafficking Victims Protection Reauthorization Act (TVPRA)?

The original Trafficking Victims Protection Act was signed into law in 2000 to address human trafficking concerns. It was subsequently reauthorized during both the Bush and Obama Administrations in 2003, 2005, 2008, and 2013.

The TVPRA of 2008, signed by President Bush, responded to concerns that unaccompanied children apprehended by the Border Patrol "were not being adequately screened" for eligibility for protection or relief in the United States. The TVPRA also directed the development of procedures to ensure that if unaccompanied children are deported, they are safely repatriated. At the outset, unaccompanied children must be screened as potential victims of human trafficking. However, as described further below, procedural protections for children are different for children from contiguous countries (i.e., Mexico and Canada) and non-contiguous countries (all others). While children from non-contiguous countries are transferred to the Department of Health and Human Services (HHS) for trafficking screening, and placed into formal immigration court removal proceedings, Mexican and Canadian children are screened by CBP for trafficking and, if no signs of trafficking or fear of persecution are reported, may be summarily returned home pursuant to negotiated repatriation agreements. The TVPRA in 2008 also ensured that unaccompanied alien children are exempt from certain limitations on asylum (e.g., a one-year filing deadline). It also required HHS to ensure "to the greatest extent practicable" that unaccompanied children in HHS custody have counsel, as described further below—not only "to represent them in legal proceedings," but to "protect them from mistreatment, exploitation, and trafficking."

## Can new arrivals obtain a grant of Temporary Protected Status?

Although Salvadorans and Guatemalans in the United States have been eligible for Temporary Protected Status (TPS) in the past, there currently is no category that would include children or families arriving today or at any point since the spring of 2014. TPS is a limited immigration status that allows an individual to remain temporarily in the United States because of civil war, natural disasters, or other emergency situations that make it difficult for a country to successfully reintegrate people. TPS requires a formal designation by the Secretary of Homeland Security, in consultation with the Secretary of State, and requires, among other things, that a country formally request this designation from the U.S. government.

## How have other countries in the region responded to the increase in child migrants?

Mexico, with support from the United States, has responded to the increasing number of children and families fleeing Central America by expanding its security measures along its southern border as well as its internal enforcement. Part of the Mexican government's southern border security plan is funded through the Mérida Initiative and as of October 2014, about $1.3 billion dollars in U.S. assistance went to Mexico through this initiative.

According to the Migration Policy Institute, migrants report an "increased presence of immigration officials in pickup trucks patrolling the roads and bus stations en route to the train line. Raids on hotels and restaurants where migrants shelter in traditional cities [i.e., cities along previously established migrant routes] have occurred. And immigration agents, in raids supported by federal police and the military, are targeting the trains, removing migrants from the train cars and detaining them. The

companies that run the cargo trains on whose roofs migrants travel (referred to as "La Bestia") also are working with the Mexican government to increase train speed in order to prevent migrants from riding on them.

Deportations from Mexico to the Northern Triangle countries increased significantly over the course of 2014, and this trend has continued into 2015. Mexico apprehended more than 15,795 minors between January and August of 2014, compared to 9,727 minors for all of 2013. According to a Pew Research Center analysis of data from the Mexican government, Mexico deported 3,819 unaccompanied minors from Central America during the first five months of FY 2015 – a 56% increase over the same period from FY 2014.

A report by the Human Rights Institute at Georgetown Law School found that while "Mexican officials are supposed to screen unaccompanied children for international protection needs, they often fail to meet this responsibility." The report also found that the detention conditions deterred children from accessing the asylum process and that the Mexican government is failing to consistently inform children of their rights or screen them for international protection eligibility. Without these practices, the report argued, "current practices place a burden on migrant children to investigate the law and procedures and affirmatively apply for asylum."

### What is in-country processing?

In November 2014, the U.S. Department of State announced the launch of its in-country refugee processing program in El Salvador, Guatemala, and Honduras. The program is intended "to provide a safe, legal, and orderly alternative to the dangerous journey that some children are currently undertaking to the United States." The new program allows parents from El Salvador, Guatemala, and Honduras who are lawfully present in the United States to submit an application to have their children join them in the United States if they qualify for refugee status or humanitarian parole.

Parents may submit applications for this program to the State Department. Once the application is submitted, the International Organization for Migration (IOM) will work with the child in country and invite them to pre-screening interviews. Both the child and the parent will have to submit to DNA testing to ensure the biological relationship, and DHS will conduct an interview for refugee eligibility. As with all refugees, the children will have to submit to and pass security checks to be eligible for refugee status. If they do not qualify for refugee status, it is possible that they may qualify for humanitarian parole on a case-by-case basis. Although humanitarian parole permits a person to travel safely to the United States to reunite with a parent, unlike refugee status, it does not provide a path to citizenship.

While this program will help some eligible children and their parents, its impact is expected to be limited. Any refugees admitted under this program would count against the current limit of 4,000 refugee admissions for Latin America and the Caribbean. In contrast, 68,541 children crossed the border in FY 2014. The program itself is rigorous, and its requirements—a parent with legal status and DNA and security checks—will limit who qualifies. Eleanor Acer of Human Rights First argued (http://www.humanrightsfirst.org/blog/country-refugee-processing-risk-children-central-america-potential-benefits-and-risks) that "[p]ractically speaking, the program will need to actually extend protection in a timely manner to a meaningful number of applicants if it is to be viewed as a credible alternative to some families with at-risk children." Additionally, Acer note that in the past, U.S. officers have used "the existence of in-country resettlement...to limit access to protection."

## Procedures and Policies: What happens to children and families when they arrive at the border?

### How are unaccompanied children treated compared to adults and children

### arriving in families?

How a noncitizen is treated upon apprehension depends on where the person is apprehended (near the border or in the interior), what country he or she is from (a contiguous country or a noncontiguous country), and whether he or she is an unaccompanied minor.

Adults and families, when apprehended in the interior, typically are placed in removal proceedings before an immigration judge. However, that is not necessarily the case for adults or families apprehended at or near the border. In FY 2013, 83 percent of adults removed by the U.S. were deported through summary, out-of-court removal proceedings (http://www.immigrationpolicy.org/just-facts/removal-without-recourse-growth-summary-deportations-united-states) by a DHS officer rather than appearing before an immigration judge. The most common summary removal processes are expedited removal (http://immigrationpolicy.org/just-facts/removal-without-recourse-growth-summary-deportations-united-states), used when a noncitizen encounters immigration authorities at or within 100 miles of a U.S. border with insufficient or fraudulent documents, and reinstatement of removal, used when a noncitizen unlawfully reenters after a prior removal order.

As discussed in detail below, unaccompanied children receive greater protections under U.S. law.

### What happens to unaccompanied children once they are in U.S. custody?

The majority of unaccompanied children encountered at the border are apprehended, processed, and initially detained by CBP. Unlike adults or families, though, unaccompanied children cannot be placed into expedited removal proceedings.

Children from non-contiguous countries, such as El Salvador, Guatemala, or Honduras, are placed into standard removal proceedings in immigration court. CBP must transfer custody of these children to Health and Human Services (HHS), Office of Refugee Resettlement (ORR), within 72 hours, as described below.

Each child from a contiguous country—Mexico or Canada—must be screened by a CBP officer to determine if he or she is unable to make independent decisions, is a victim of trafficking, or fears persecution in his home country. If none of these conditions apply, CBP will immediately send the child back to Mexico or Canada through a process called "voluntary return." Return occurs pursuant to agreements with Mexico and Canada to manage the repatriation process.

Non-governmental organizations (NGOs) have expressed concern that CBP is the "wrong agency" to screen children for signs of trauma, abuse, or persecution. The public justice group Appleseed issued a report that stated, "as a practical matter" CBP screening "translates into less searching inquiries regarding any danger they are in and what legal rights they may have." Appleseed also expressed concern that the U.S.-Mexico repatriation agreement has been geared towards "protocols of repatriations logistics," rather than best practices for child welfare.

### Do children get attorneys?

In general, children facing deportation—just like adults facing deportation—are not provided government-appointed counsel to represent them in immigration court. Under the immigration laws, all persons have the "privilege" of being represented "at no expense to the Government." This means that only those individuals who can afford a private lawyer or those who are able to find pro bono counsel to represent them free of charge are represented in immigration court. And, although Congress has directed the Secretary of Health and Human Services (HHS) to ensure the provision of counsel to unaccompanied children "to the greatest extent practicable," Congress further explained that the Secretary "shall make every effort to utilize the services of pro bono counsel who agree to provide representation to such children without charge."

A vast network of pro bono legal service providers has responded to the call, and during the past year, the Obama Administration provided some funding to legal service providers in order to increase representation for unaccompanied children. The Justice AmeriCorps program, announced in June 2014, awarded $1.8 million for representation of certain children in immigration court, and HHS subsequently provided an additional $9 million for representation in FY 2014 and FY 2015.

But while pro bono legal service providers represent many children nationwide, they still are unable to meet the need. As of April 2015, children in over 38,000 pending cases remained unrepresented. These children are forced to appear before an immigration judge and navigate the immigration court process, including putting on a legal defense, without any legal representation. In contrast, DHS, which acts as the prosecutor in immigration court and argues for the child's deportation, is represented in every case by a lawyer trained in immigration law. As a result, advocates, including the American Immigration Council, filed a nationwide class-action lawsuit challenging the federal government's failure to provide children with legal representation in immigration court. The case, *JEFM v. Holder* (http://www.legalactioncenter.org/litigation/appointed-counsel-children-immigration-proceedings), is currently pending before a federal district court in Washington State.

### How have immigration courts responded to the increased volume of cases?

In the summer of 2014, the Executive Office for Immigration Review (EOIR), the division within the Department of Justice which houses the immigration courts, adopted a new policy with respect to prioritizing cases for adjudication. The stated goal of this new policy was to "[f]ocus the department's immigration processing resources on recent border crossers" (i.e., individuals who arrived on or after May 1, 2014). Under the policy, the immigration courts are to prioritize the following cases: (1) unaccompanied children who recently crossed the southwest border; (2) families who recently crossed the border and are held in detention; (3) families who recently crossed the border but are on "alternatives to detention" and (4) other detained cases. Immigration courts now schedule a first hearing for unaccompanied children within 21 days of the court's receiving the case. Given the speed at which these cases progress, the expedited children's dockets often are referred to as "rocket dockets." Children on the rocket dockets may be provided with less time to find attorneys before immigration courts move forward with their cases—and, as a result, may be required to explain why they should not be deported without the help of an attorney. If they are unable to do so, unrepresented children may be ordered removed or required to "voluntarily" depart from the United States.

### Can unaccompanied children be detained?

Yes, but special laws govern the custody of children based on child welfare standards that take the "best interests" of the child into account. Unaccompanied children must be transferred by DHS to the custody of HHS within 72 hours of apprehension, under the Homeland Security Act of 2002 and TVPRA of 2008. HHS's Office of Refugee Resettlement (ORR) then manages custody and care of the children until they can be released to family members or other individuals or organizations while their court proceedings go forward.

Under the TVPRA of 2008, HHS is required to "promptly place" each child in its custody "in the least restrictive setting that is in the best interests of the child." As such, children in ORR care are generally housed through a network of state-licensed, ORR-funded care providers, who are tasked with providing educational, health, and case management services to the children.

Under international law, children "should in principle not be detained at all," according to UNHCR. Detention, if used, should only be a "measure of last resort" for the "shortest appropriate period of time," with an overall "ethic of care." Detention has "well-documented" negative effects on children's mental and physical development, including severe harm such as anxiety, depression, or long-term cognitive damage, especially when it is indefinite in nature.

Children who arrive with a parent may be detained by DHS in family detention centers, described below.

## Can unaccompanied children be released from custody?

Yes. ORR seeks to reunify children with family members or release them to other individual or organizational sponsors whenever possible, on the grounds that children's best interests are served by living in a family setting. ORR also is required to ensure that individuals taking custody of the children are able to provide for their well-being. Federal regulations, following a court settlement (https://www.aclu.org/files/pdfs/immigrants/flores_v_meese_agreement.pdf) in the case *Flores v. Reno*, outline the following preferences for sponsors: (1) a parent; (2) a legal guardian; (3) an adult relative; (4) an adult individual or entity designated by the child's parent or legal guardian; (5) a licensed program willing to accept legal custody; or (6) an adult or entity approved by ORR. The sponsor must agree to ensure that the child attends immigration court.

As of May 2014, ORR reported that the average length of stay in its facilities was approximately 35 days and that about 85 percent of the children served are released while their deportation proceedings are in progress.

## Does the Government detain families?

Yes. The increase in families fleeing violence and arriving at the southwest border—frequently mothers with children—has reignited a debate over the appropriate treatment of families in the immigration system. Family immigration detention has a complicated and troubled history in the U.S.

Prior to 2006, ICE commonly detained parents and children separately. In FY 2006 appropriations language, however, Congress directed ICE to either "release families," use "alternatives to detention such as the Intensive Supervised Appearance Program," or, if necessary, use "appropriate" detention space to house families together. ICE responded by opening the T. Don Hutto Residential Center in Texas, with over 500 beds for families. But, as the Women's Refugee Commission explained, the "Residential Center" was a "former criminal facility that still look[ed] and [felt] like a prison." The Hutto detention center became the subject of a lawsuit, a human rights investigation, multiple national and international media reports, and a national campaign to end family detention. In 2009, ICE ended the use of family detention at Hutto, withdrew plans for three new family detention centers, and said that detention would be used more "thoughtfully and humanely."

Yet, in the summer of 2014, in response to the increase in families fleeing violence and arriving at the southwest border, the federal government established a makeshift detention center on the grounds of the Federal Law Enforcement Training Center in Artesia, New Mexico, a remote location more than three hours' drive from the nearest major city. According to the DHS Secretary, the detention and prompt removal of families was intended to deter others from coming to the United States.

Over the course of the summer and fall 2014, over hundreds of women and children were detained in Artesia. The facility was ultimately closed several months later, but the government has continued its policy of detaining women and children. Currently families are housed in three facilities: the South Texas Family Residential Center in Dilley, Texas, Karnes County Residential Center in Karnes City, Texas,

and Berks Family Residential Center in Leesport, Pennsylvania. Both the Dilley and Karnes facilities are owned and operated by private prison companies. By the end of May 2015, Dilley's capacity will be 2,400, making it by far the largest family detention center in the United States.

Family detention is rarely in the "best interests of the child," as opposed to community-based alternatives. Detaining children leads to serious mental health problems and chronic illnesses, and detaining families can have long-lasting effects on the psychological well-being of both parents and children.

In 2014 and 2015, several detained families filed lawsuits to challenge various aspects of family detention. One case challenges the government's policy of detaining families as a means to deter others from coming to the United States. In this case, *RILR v. Johnson* (https://www.aclu.org/cases/rilr-v-johnson), a federal court issued a preliminary injunction to prevent the government from using deterrence as a factor in making a bond determination. In a second case, lawyers for children held in family detention facilities have claimed (http://centerforhumanrights.org/PDFs/FloresPressRelease020215.pdf) that the government is violating the terms of the settlement agreement in *Flores*, discussed above. This settlement established national standards for the detention, release and treatment of children detained by DHS for deportation.

### Can alternatives to detention be used for families?

Yes. ICE operates two alternatives to detention (ATD) programs for adult detainees—a "full service" program with case management, supervision, and monitoring (either by GPS or telephone check-in), and a "technology-only" program with monitoring only. According to U.S. government data, 95 percent of participants in ICE's full service program appeared at scheduled court hearings from fiscal years 2011 to 2013. Further, in FY 2012 only 4 percent were arrested by another law enforcement agency. ICE's alternatives program, as well as being more humane, is also less expensive than detention—$10.55/day as opposed to $158/day. As to asylum seekers, a prior U.S. government-commissioned study found that "asylum seekers do not need to be detained to appear," and "[t]hey also do not seem to need intensive supervision." Bipartisan support has emerged for alternatives to immigration detention. ICE, in early 2015, issued requests for proposals for "family case management services" for up to 300 families apiece in Baltimore/Washington, NYC/Newark, Miami, Chicago and Los Angeles.

# U.S. Government Response and Proposed Solutions

During the summer of 2014, the Obama Administration's response to Central American children and families arriving in the U.S. focused largely on enforcement measures, rather than humanitarian measures that had previously received legislative support, and would have been more tailored towards the vulnerable arriving population.

The Administration requested significant funding to support an "aggressive deterrence strategy" and implemented family detention and "rocket dockets" for children and families. Its in-country refugee processing program has been expected to assist relatively few people. Congressional legislative proposals, at the time and since, have largely focused on rolling back procedural protections for children. That said, proposals also exist to more holistically protect children and families reaching the United States, several of which passed the Senate in 2013 as part of its comprehensive immigration reform bill.

### U.S. Government Response—Administration's and Congress' Actions

The following table summarizes the Administration's and Congress' major actions since summer 2014:

| Date | Who | Action Taken |
|------|-----|--------------|
| June 2, 2014 | President Obama | Declared "urgent humanitarian situation (https://www.whitehouse.gov/the-press-office/2014/06/02/presidential-memorandum-response-influx-unaccompanied-alien acr)" and directed a coordinated federal response under emergency homeland secu authorities. |
| June 20, 2014 | DHS | Announced intention to detain families at the Border Patrol training center in Artesi; NM. Detainees arrived in Artesia around the beginning of July. |
| June 30, 2014 | President Obama | Sent letter (https://www.whitehouse.gov/the-press-office/2014/06/30/letter-presider address-humanitarian-situation-rio-grande-valle) to Congressional leaders declaring seek emergency funding for "an aggressive deterrence strategy focused on the remo repatriation of recent border crossers." |
| July 8, 2014 | President Obama | Sent letter (https://www.whitehouse.gov/sites/default/files/omb/assets/budget_amendments/e supplemental-request-to-congress-07082014.pdf) to Speaker Boehner (attaching ON analysis) requesting $3.7 billion in emergency appropriations.  Request included:<br>• **HHS:** $1.8 billion for care of unaccompanied children<br>• **DHS-ICE:** $1.1 billion (incl. $879 million for detention and removal)<br>• **DHS-CBP:** $432 million (incl. $364 million for additional apprehensions)<br>• **State:** $295 million in Central American foreign aid<br>• **DOJ-EOIR:** $45 million for additional Immigration Judges, $15 million to prov lawyers for children. |
| July 9, 2014 | DOJ-EOIR | Immigration courts prioritized cases of recent border crossers who are unaccompar children, families in detention, and families on alternatives to detention. |
| July 11, 2014 | DHS | Modified contract with Karnes County, TX to detain families at ICE's existing detentio for adults there. |
| July 31, 2014 | Senate | Bill to provide $2.7 billion in emergency appropriations failed in procedural vote. |
| August 1, 2014 | House of Representatives | • Passed legislation to repeal DACA.<br>• Also passed legislation to provide $694 million in emergency appropriations, the "Secure the Southwest Border Act" to roll back procedural protections for Central American unaccompanied children. |
| August 1, 2014 | DHS | • Announced intent to transfer $405 million from other DHS programs to add( humanitarian challenge. Congressional Appropriations Committees finished approving transfers to ICE on August 6.<br>• ICE began to detain families at Karnes, TX detention facility. |
| September 22, 2014 | DHS | Agreed to pay town of Eloy, AZ to modify its existing agreement with ICE so that the company CCA can build a new family detention facility in Dilley, TX.  DHS publicly con the opening of Dilley the next day. |

| Date | Who | Action Taken |
|------|-----|--------------|
| November 18, 2014 | DHS | Announced ICE will close the Artesia, NM family detention facility and transfer the de the new Dilley, TX family detention facility. |
| December 3, 2014 | State Dep't | Launched in-country refugee processing program in El Salvador, Guatemala, and Ho |
| December 16, 2014 | Congress and President Obama | FY 2015 "Cromnibus" appropriations bill, signed by President, provided:<br>• **HHS:** $80 million increase to care for unaccompanied children<br>• **State:** $260 million to implement a "prevention and response strategy" in Ce America<br>• **DOJ-EOIR:** $35 million increase for immigration courts<br>• **Education:** $14 million to assist state and local educational agencies experie increases in immigrant youth. |
| February 2, 2015 | President Obama and DHS | The Administration's request for DHS funding for FY 2016 included:<br>• **DHS-ICE:** $893 million for salaries and expenses over FY '15 request, incl. $6 million increase for detention ($435 million for family detention)<br>• **DHS-CBP:** $743 million increase for salaries and expenses over FY '15 reques |
| March 4, 2015 | Congress and President Obama | FY 2015 DHS Appropriations bill, signed by President, provided:<br>• **DHS-ICE:** $703 million increase for salaries and expenses, incl. $539 million in for detention ($362 million for family detention)<br>• **DHS-CBP:** $314 million increase for salaries and expenses over FY '14. |
| May 27 and June 1, 2015 | House and Senate | 136 Representatives and 33 Senators wrote letters asking DHS Secretary Johnson to family detention. |

## Recent Legislative Proposals

Since the summer of 2014, most legislative proposals have focused on rolling back the procedural protections that the TVPRA affords to Central American unaccompanied children. For example, the House's 2014 "Secure the Southwest Border Act" would have amended the TVPRA to (1) treat children from non-contiguous countries similarly to Mexican and Canadian children, but (2) strike the current requirement that the child be able to make an "independent decision to withdraw the child's application for admission" before proceeding with voluntary return; (3) require those children who may have been trafficked or fear return [or require the remaining children] to appear before an immigration judge for a hearing within 14 days of screening; and (4) impose mandatory detention until that hearing.

Other proposals have offered variations on these themes. For example, the "Protection of Children Act of 2015," which the House Judiciary Committee moved forward on March 4, 2015, would enact the above four changes—but additionally, expand from 72 hours to 30 days the time limit for CBP to transfer remaining unaccompanied children to HHS custody. That bill, among others, also proposes restricting HHS' ability to provide counsel to unaccompanied children. Or, the "HUMANE Act," sponsored by Sen. John Cornyn (R-TX) and Rep. Henry Cuellar (D-TX) in 2014, would have gone further

to place children with a fear of return into a new 7-day expedited process, during which the child would be required to prove her eligibility for immigration relief to an immigration judge while mandatorily detained, before moving on to a standard removal proceeding in immigration court.

## Proposed Solutions

Before summer 2014, bipartisan support existed for legislative reforms to more holistically protect children and families reaching the United States. Since then, NGOs and advocacy groups have reiterated support for those reforms, as well as for aid to address root causes of child and family migration from Central America.

These reforms include:

- *Incorporating a "best interests of the child" standard into all decision-making, not just custody decisions.* Bipartisan immigration reform legislation which passed the Senate in 2013 (S. 744) would have required the Border Patrol, in making repatriation decisions, to give "due consideration" to the best interests of a child, "family unity," and "humanitarian concerns." Amendment 1340 to S. 744, which was not voted on as part of a compromise, would have made the best interests of a child the "primary consideration" in all federal decisions involving unaccompanied immigrant children. Organizations have also recommended adopting more child-specific procedures.
- *Child welfare screening to replace or augment Border Patrol screening.* Border Patrol agents are currently tasked with screening Mexican and Canadian children for trafficking and persecution and preventing their return to persecutors or abusers. NGOs have uniformly questioned Border Patrol's ability to do so adequately, and reform proposals have ranged from improved training for CBP officers (included in S. 744), to pairing CBP screeners with child welfare experts (also in S. 744) or NGO representatives, to replacing CBP screeners with USCIS asylum officers. CBP Commissioner Kerlikowske recently expressed openness towards similar proposals.
- *Due process protections and resources.* NGOs have advocated for a system that provides procedural protections and resources to appropriately protect children and families from violence, under international and U.S. laws, without unduly delaying decision making. Proposals include appointed counsel, additional resources to legal orientation programs and additional resources to backlogged immigration courts (all included in S. 744). More recent proposals also include additional U.S. Citizenship and Immigration Services (USCIS) asylum officers, and additional post-release caseworker services, to protect children, assist families, and ensure attendance at proceedings.
- *Detention reforms.* NGOs have proposed that children be detained as little as possible, released to families or other sponsors whenever appropriate, and if detained, supervised in a community-based setting because of detention's severe impact on children. At least one Senator has promised legislation to end the detention of asylum-seeking families if no family member poses a threat to the public or a flight risk. Along these lines, organizations and legislators have recommended improving detention conditions, and expanding alternatives to detention (as S. 744 proposed), by reallocating detention funding to those cheaper alternatives.
- *Aid to sending countries.* NGOs have proposed aid to sending countries and Mexico, to invest in systems that protect and care for children, help youth live productive lives, and ultimately reduce violence and address root causes of flight. In January 2015, the White House announced it was seeking $1 billion in Central American assistance in its FY 2016 budget.

1331 G St. NW, Suite 200, Washington, D.C., 20005 | 202-507-7500
Copyright American Immigration Council. All rights reserved.
Photo Credits (/content/photo-credits) | Sitemap (/sitemap) | Terms of Use (/terms-of-use)

# EXHIBIT E



**Congressional Research Service**
*Informing the legislative debate since 1914*

# Unaccompanied Alien Children: An Overview

**William A. Kandel**
Analyst in Immigration Policy

January 18, 2017

Congressional Research Service
7-5700
www.crs.gov
R43599

# Summary

In FY2014, the number of unaccompanied alien children (UAC, unaccompanied children) that were apprehended at the Southwest border while attempting to enter the United States without authorization reached a peak, straining the system put in place over the past decade to handle such cases. Prior to FY2014, UAC apprehensions were steadily increasing. For example, in FY2011, the U.S. Border Patrol (USBP) apprehended 16,067 unaccompanied children at the Southwest border, whereas in FY2014 more than 68,500 unaccompanied children were apprehended. In FY2015, UAC apprehensions declined 42% to 39,970. At the close of FY2016 they increased to 59,692, roughly 20,000 more than in FY2015, and 9,000 less than the peak of FY2014. During the first two months of FY2017 (October and November, 2016), USBP apprehended 14,128 unaccompanied children. Apprehensions in the first two months of FY2015 and FY2016 were 5,143 and 10,588, respectively.

UAC are defined in statute as children who lack lawful immigration status in the United States, who are under the age of 18, and who either are without a parent or legal guardian in the United States or without a parent or legal guardian in the United States who is available to provide care and physical custody. Two statutes and a legal settlement directly affect U.S. policy for the treatment and administrative processing of UAC: the Trafficking Victims Protection Reauthorization Act of 2008 (P.L. 110-457); the Homeland Security Act of 2002 (P.L. 107-296); and the *Flores Settlement Agreement* of 1997.

Agencies in the Department of Homeland Security (DHS) and the Department of Health and Human Services (HHS) share responsibility for the processing, treatment, and placement of UAC. DHS's Customs and Border Protection (CBP) apprehends and detains unaccompanied children arrested at the border. DHS's Immigration and Customs Enforcement (ICE) handles custody transfer and repatriation responsibilities, apprehends UAC in the interior of the country, and represents the government in removal proceedings. HHS's Office of Refugee Resettlement (ORR) coordinates and implements the care and placement of unaccompanied children in appropriate custody.

Foreign nationals from El Salvador, Guatemala, Honduras, and Mexico accounted for almost all UAC cases in recent years, especially in FY2014. In FY2009, Mexico accounted for 82% of the 19,688 UAC apprehensions at the Southwest border, while the other three Central American countries accounted for 17%. In FY2014, the proportions had almost reversed, with Mexican nationals comprising 23% of UAC apprehensions and the three Central American countries comprising 77%. In FY2016, Mexican nationals made up 20% of all UAC apprehensions.

To address the crisis at its peak in 2014, the Obama Administration developed a working group to coordinate the efforts of federal agencies involved. It also opened additional shelters and holding facilities to accommodate the large number of UAC apprehended at the border. In June 2014, the Administration announced plans to provide funding to the affected Central American countries for a variety of programs and security-related initiatives to mitigate the flow of unaccompanied migrant children. In July 2014, the Administration requested, and Congress debated but did not approve, $3.7 billion in FY2014 supplemental appropriations to address the crisis.

For FY2015, Congress appropriated nearly $1.6 billion for the Refugee and Entrant Assistance Programs in ORR, most of which was directed toward the UAC program (P.L. 113-235). For DHS agencies, Congress appropriated $3.4 billion for detection, enforcement, and removal operations, including for the transport of unaccompanied children for CBP. The Department of Homeland Security Appropriations Act, FY2015 (P.L. 114-4) also allowed the Secretary of Homeland Security to reprogram funds within CBP and ICE and transfer such funds into the two

agencies' "Salaries and Expenses" accounts for the care and transportation of unaccompanied children. The act also allowed for several DHS grants awarded to states along the Southwest border to be used by recipients for costs or reimbursement of costs related to providing humanitarian relief to unaccompanied children. Congress continued to provide base funding at comparable levels for FY2016, but did not appropriate funds for contingency funding that was requested by the Administration to address potential surges in UAC flows.

Congress has passed two continuing resolutions to fund ORR for FY2017 (P.L. 114-223 and P.L. 114-254), both of which maintain funding at levels and conditions comparable to FY2016. For both resolutions, Congress has granted HHS the authority to transfer funds from other HHS budget accounts to address higher than anticipated caseloads. The second CR also contains a special "anomaly" provision authorizing HHS to transfer $300 million to fund ORR programs dedicated to unaccompanied children as of February 1, 2017. After March 1, 2017, if the UAC caseload for FY2017 exceeds by 40% the UAC caseload for the comparable FY2016 period, the CR will appropriate an additional $200 million in new funding.

# Contents

Background ........................................................................................................................ 1
Scope of the Issue............................................................................................................. 2
Current Policy.................................................................................................................... 3
Processing and Treatment of Apprehended UAC .............................................................. 4
    Customs and Border Protection.................................................................................... 5
    Immigration and Customs Enforcement ....................................................................... 7
    Office of Refugee Resettlement .................................................................................... 8
    U.S. Citizenship and Immigration Services ................................................................ 10
    The Executive Office for Immigration Review.............................................................11
Administrative and Congressional Action ......................................................................... 13
    Administrative Action ................................................................................................ 13
    Congressional Action ................................................................................................. 14
        Appropriations ..................................................................................................... 15
Going Forward ................................................................................................................ 17

## Figures

Figure 1. UAC Apprehensions at the Southwest Border by Country of Origin, FY2008 -
    FY2017........................................................................................................................ 2
Figure 2. UACs Apprehended and Referred to ORR Custody, FY2008 - FY2016 ........................ 9

## Tables

Table 1. UAC Initial Case Completion by Outcome and Legal Representation ........................... 12

## Contacts

Author Contact Information ............................................................................................... 18

# Background

After several years of increases, the number of unaccompanied alien[1] children (UAC) apprehended at the Southwest border by the Department of Homeland Security's (DHS's) Customs and Border Protection (CBP) peaked at 68,541 in FY2014. Some Members of Congress as well as the Obama Administration have characterized the issue as a humanitarian crisis.[2]

The reasons why they migrate to the United States are often multifaceted and difficult to measure analytically. The Congressional Research Service (CRS) has analyzed several out-migration-related factors, such as violent crime rates, economic conditions, rates of poverty, and the presence of transnational gangs.[3] CRS also has analyzed in-migration-related factors, such as the search for economic opportunity, the desire to reunite with family members, and U.S. immigration policies.

Some have suggested that the sizable increase in UAC flows in recent years results from a perception of relaxed U.S. immigration policies toward children under the Obama Administration.[4] These critics also cite a 2008 law[5] that treats UAC from contiguous countries differently than those from noncontiguous countries (see the section "Customs and Border Protection").

Unaccompanied alien children are defined in statute as children who: lack lawful immigration status in the United States;[6] are under the age of 18; and are without a parent or legal guardian in the United States or without a parent or legal guardian in the United States who is available to provide care and physical custody.[7] They most often arrive at U.S. ports of entry or are apprehended along the southwestern border with Mexico. Less frequently, they are apprehended in the interior of the country and determined to be juveniles and unaccompanied.[8] Although most are age 14 or older, apprehensions of UAC under age 13 have increased.[9]

---

[1] *Alien*, a technical term appearing throughout the Immigration and Nationality Act (INA), refers to a foreign national who is not a citizen or national of the United States.

[2] Senate Judiciary Committee hearing on *Oversight of the Department of Homeland Security*, June 11, 2014 (hereinafter referred to as *Senate Oversight Hearing).*

[3] See CRS Report R43628, *Unaccompanied Alien Children: Potential Factors Contributing to Recent Immigration.*

[4] These critics often cite the Border Security, Economic Opportunity, and Immigration Modernization Act (S. 744, 113th Congress), passed by the Senate in 2013, which would allow certain unlawfully present aliens to adjust to a lawful immigration status; and the administrative policy entitled Deferred Action for Childhood Arrivals (DACA), which grants certain aliens who arrived in the United States as children prior to a certain period some protection from removal for at least two years. For an example of these arguments, see U.S. Congress, Senate Committee on the Judiciary, *Oversight of the Department of Homeland Security*, 113th Cong., 2nd sess., June 11, 2014. For a discussion of S. 744, see archived CRS Report R43099, *Comprehensive Immigration Reform in the 113th Congress: Short Summary of Senate-Passed S. 744.* For a discussion of DACA, see CRS Report RL33863, *Unauthorized Alien Students: Issues and "DREAM Act" Legislation.*

[5] The William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (P.L. 110-457).

[6] The child may have entered the country illegally or been admitted legally but overstayed his or her duration of admittance (i.e., a visa overstay.)

[7] 6 U.S.C. §279(g)(2). Although these children may have a parent or guardian who lives in the United States, they are classified as unaccompanied if the parent or guardian cannot provide *immediate* care.

[8] A juvenile is classified as *unaccompanied* if neither a parent nor a legal guardian is with the juvenile alien at the time of apprehension, or within a geographical proximity to quickly provide care for the juvenile. 8 CFR §236.3(b)(1).

[9] White House, DHS and HHS, "Press Call Regarding the Establishment of the Inter-Agency Unified Coordination Group on Unaccompanied Alien Children," press release, June 3, 2014.

This report opens with an analysis of UAC apprehension data. It then discusses current policy on the treatment, care, and custody of the population and describes the responsibilities of each federal agency involved with the population. The report then discusses both administrative and congressional actions to deal with the UAC surge in FY2014 and action since then to address possible future surges.

## Scope of the Issue

Since FY2011, UAC apprehensions increased each year through FY2014: from 16,067 in FY2011 to 24,481 in FY2012 to 38,759 in FY2013 and 68,541 in FY2014 (**Figure 1**). At the close of FY2014, the Border Patrol had apprehended more UAC than in any of the previous six years and close to four times as many UAC as in FY2011. In FY2015, apprehensions numbered 39,970, a 42% drop from FY2014 apprehensions.[10] At the close of FY2016 they stood at 59,692, roughly 20,000 more than in FY2015, and 9,000 less than the peak of FY2014. During the first two months of FY2017 (October and November, 2016), USBP apprehended 14,128 unaccompanied alien children.[11] As a basis for comparison, apprehensions in the first two months of FY2015 and FY2016 numbered 5,143 and 10,588, respectively

**Figure 1. UAC Apprehensions at the Southwest Border by Country of Origin, FY2008-FY2017**



Sources: For FY2008-FY2013: U.S. Department of Homeland Security, United States Border Patrol, *Juvenile and Adult Apprehensions—Fiscal Year 2013*. For FY2014-FY2017, Customs and Border Protection, "Southwest Border Unaccompanied Alien Children," http://www.cbp.gov/newsroom/stats/southwest-border-unaccompanied-children.

Notes: FY2017 data include data on only the first two months of the fiscal year.

---

[10] Customs and Border Protection, "Southwest Border Unaccompanied Alien Children," https://www.cbp.gov/newsroom/stats/southwest-border-unaccompanied-children/fy-2015.

[11] Customs and Border Protection, "Southwest Border Unaccompanied Alien Children," http://www.cbp.gov/newsroom/stats/southwest-border-unaccompanied-children/fy-2017.

Nationals of Guatemala, Honduras, El Salvador, and Mexico account for the majority of unaccompanied alien children apprehended at the Mexico-U.S. border (**Figure 1**). Flows of UAC from Mexico rose substantially in FY2009 and have fluctuated since then between roughly 11,000 and 17,000. In contrast, UAC from Guatemala, Honduras, and El Salvador increased sizably starting in FY2011. In FY2009, Mexican UAC accounted for 82% of 19,668 UAC apprehensions, while the other three Central American countries accounted for 17%. By September 30, 2014, those proportions had almost reversed, with Mexican UAC comprising 23% of the 68,541 UAC apprehensions and UAC from the three Central American countries comprising 75%.[12] In FY2015 and FY2016, the percentages of unaccompanied children originating from Mexico were 28% and 20%, respectively.

The majority of UAC apprehensions have occurred within the Rio Grande and Tucson border sectors (62% and 11%, respectively, in FY2016).[13] The proportions of UAC who were female or who were under the age of 13 also increased in FY2014, and ORR data on UAC referred to the agency indicate an increase in the female UAC proportion from 23% in FY2012 to 33% in FY2016.[14] Apprehensions of family units (unaccompanied children with a related adult) increased from 14,855 in FY2013 to 68,445 in FY2014, declined to 39,838 in FY2015 and increased to 77,674 in FY2016. In the first two months of FY2017, family unit apprehensions totaled 28,691.[15] Of these apprehended family units in FY2016 and FY2017, 95% originated from Guatemala, El Salvador, and Honduras.

# Current Policy

Two laws and a settlement most directly affect U.S. policy for the treatment and administrative processing of UAC: the *Flores Settlement Agreement* of 1997; the Homeland Security Act of 2002; and the Trafficking Victims Protection Reauthorization Act of 2008.

During the 1980s, allegations of UAC mistreatment by the former Immigration and Naturalization Service (INS)[16] caused a series of lawsuits against the government that eventually resulted in the *Flores Settlement Agreement* (*Flores Agreement*) in 1997.[17] The *Flores Agreement* established a nationwide policy for the detention, treatment, and release of UAC and recognized the particular vulnerability of UAC as minors while detained without a parent or legal guardian present.[18] It required that immigration officials detaining minors provide (1) food and drinking

---

[12] The surge in the number of children migrating to the United States mirrors a similar increase among adults. From FY2011 through FY2015, the number of Border Patrol apprehensions of third-country nationals increased almost threefold from 54,098 to 148,995. Over the same period, those apprehended from Mexico decreased from 286,154 to 188,122. United States Border Patrol, *Total Illegal Alien Apprehensions by Fiscal Year, FY2000-FY2015*, data provided by CBP to CRS.

[13] Customs and Border Protection, "Southwest Border Unaccompanied Alien Children," http://www.cbp.gov/newsroom/stats/southwest-border-unaccompanied-children/fy-2016.

[14] U.S. Department of Health and Human Services, Office of Refugee Resettlement, "Facts and Data," https://www.acf.hhs.gov/orr/about/ucs/facts-and-data.

[15] Customs and Border Protection, "Southwest Border Unaccompanied Alien Children," http://www.cbp.gov/newsroom/stats/southwest-border-unaccompanied-children/fy-2017.

[16] The Homeland Security Act of 2002 dissolved the Immigration and Naturalization Service (INS) and its functions were split in the Departments of Homeland Security, Justice, and Health and Human Services.

[17] *Flores v. Meese—Stipulated Settlement Agreement* (U.S. District Court, Central District of California, 1997). Many of the agreement's terms have been codified at 8 CFR §§236.3, 1236.3.

[18] See DHS Office of Inspector General, *CBP's Handling of Unaccompanied Alien Children*, OIG-10-117, Washington, DC, September 2010.

water, (2) medical assistance in emergencies, (3) toilets and sinks, (4) adequate temperature control and ventilation, (5) adequate supervision to protect minors from others, and (6) separation from unrelated adults whenever possible. For several years following the *Flores Agreement*, criticism continued over whether the INS had fully implemented the drafted regulations.[19]

Five years later, the Homeland Security Act of 2002 (HSA; P.L. 107-296) divided responsibilities for the processing and treatment of UAC between the newly created Department of Homeland Security (DHS) and the Department of Health and Human Services' (HHS's) Office of Refugee Resettlement (ORR). To DHS, the law assigned responsibility for the apprehension, transfer, and repatriation of UAC. To HHS, the law assigned responsibility for coordinating and implementing the care and placement of UAC in appropriate custody, reunifying UAC with their parents abroad if appropriate, maintaining and publishing a list of legal services available to UAC, and collecting statistical information on UAC, among other responsibilities.[20] The HSA also established a statutory definition of UAC as unauthorized minors not accompanied by a parent or legal guardian. Despite these developments, criticism continued that the *Flores Agreement* had not been fully implemented.

In response to ongoing concerns that UAC apprehended by the Border Patrol were not being adequately screened for reasons they should not be returned to their home country, Congress passed the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA, P.L. 110-457). The TVPRA directed the Secretary of DHS, in conjunction with other federal agencies, to develop policies and procedures to ensure that UAC in the United States are safely repatriated to their country of nationality or of last habitual residence. The section set forth special rules for UAC from contiguous countries (i.e., Mexico and Canada), allowing such children, under certain circumstances, to return to Mexico or Canada without additional penalties, and directing the Secretary of State to negotiate agreements with Mexico and Canada to manage the repatriation process. The TVPRA mandated that unaccompanied alien children from countries other than Mexico or Canada—along with UAC from those countries who are apprehended away from the border—are to be transferred to the care and custody of HHS and placed in formal removal proceedings. The TVPRA required that children from contiguous countries be screened within 48 hours of being apprehended to determine whether they should be returned to their country or transferred to HHS and placed in removal proceedings.

# Processing and Treatment of Apprehended UAC

Several DHS agencies handle the apprehension, processing, and repatriation of UAC, while HHS handles the care and custody of UAC. The Executive Office for Immigration Review (EOIR) in the U.S. Department of Justice conducts immigration removal proceedings.

CBP apprehends, processes, and detains the majority of UAC arrested along U.S. borders. DHS's Immigration and Customs Enforcement (ICE) physically transports UAC from CBP to ORR custody. ORR is responsible for detaining and sheltering UAC who are from noncontiguous countries and those from contiguous countries (i.e., Canada and Mexico) who may be victims of trafficking or have an asylum claim, while they await an immigration hearing. DHS's U.S. Citizenship and Immigration Services (USCIS) is responsible for the initial adjudication of

---

[19] See U.S. Department of Justice, Office of the Inspector General, *Unaccompanied Juveniles in INS Custody*, Executive Summary, Report no. I-2001-009, September 28, 2001.

[20] ORR assumed care of UAC on March 1, 2003, and created the Division of Unaccompanied Children's Services (DUCS) for addressing the requirements of this population. P.L. 107-296, Section 462.

asylum applications filed by UAC. DOJ's EOIR conducts immigration proceedings that determine whether UAC may be allowed to remain in the United States or must be deported to their home countries. ICE is responsible for returning UAC who are ordered removed from the United States to their home countries. The following sections discuss the role of each of these federal agencies in more detail.

## Customs and Border Protection

The Office of Border Patrol (OBP)[21] and the Office of Field Operations (OFO)[22] are responsible for apprehending and processing UAC that come through a port of entry (POE) or are found at or near the border.[23] UAC that are apprehended between POEs are transported to Border Patrol stations, and if they are apprehended at POEs, they are escorted to CBP secondary screening areas. In both cases, when CBP confirms a juvenile has entered the country illegally and unaccompanied, he or she is classified as a UAC and processed for immigration violations, and the appropriate consulate is notified that the juvenile is being detained by DHS.

The Border Patrol apprehends the majority of UAC at or near the border. They also process UAC.[24] With the exception of Mexican and Canadian UAC who meet the criteria discussed below, the Border Patrol has to turn UAC over to ICE for transport to ORR within 72 hours of determining that the children are UAC.[25] Until 2008, the Border Patrol, as a matter of practice, returned Mexican UAC to Mexico. Under this practice, Mexican UAC were removed through the nearest POE and turned over to a Mexican official within 24 hours and during daylight.

As mentioned, the TVPRA required the Secretary of Homeland Security, in conjunction with the Secretary of State, the Attorney General, and the Secretary of Health and Human Services, to develop policies and procedures to ensure that UAC are safely repatriated to their country of nationality or last habitual residence. Of particular significance, the TVPRA required CBP to follow certain criteria for UAC who are nationals or habitual residents from a contiguous country (i.e., Canada and Mexico).[26] In these cases, CBP personnel must screen each UAC within 48 hours of apprehension to determine the following:

- the UAC has not been a victim of a severe form of trafficking in persons and there is no credible evidence that the minor is at risk should the minor be returned to his/her country of nationality or last habitual residence;
- the UAC does not have a possible claim to asylum; and

---

[21] OBP includes the Border Patrol. OBP and the Border Patrol are used interchangeably throughout this section. OBP is responsible for immigration and customs enforcement *between ports of entry.*

[22] The OFO oversees CBP officers who inspect travelers and goods *at ports of entry.*

[23] When OBP and OFO are both referenced together in this section, "CBP" is used.

[24] The processing of UAC includes gathering biographic information such as their name and age as well as their citizenship and whether they are unaccompanied. Border Patrol agents also collect biometrics on UAC and query relevant immigration, terrorist, and criminal databases.

[25] The 72-hour time period was established in statute by the TVPRA.

[26] 8 U.S.C. §§1101 et seq. Although the screening provision only applies to UAC from contiguous countries, in March 2009 DHS issued a policy that, in essence, made the screening provisions applicable to all UAC. Testimony of Office of Immigration and Border Security Acting Deputy Assistant Secretary Kelly Ryan, in U.S. Congress, Senate Committee on the Judiciary, *Trafficking Victims Protection Reauthorization Act: Renewing the Commitment to Victims of Human Trafficking,* 112ᵗʰ Cong., 1ˢᵗ sess., September 13, 2011.

- the UAC is able to make an independent decision to voluntarily return to his/her country of nationality or last habitual residence.[27]

If CBP personnel determine the minor to be inadmissible under the Immigration and Nationality Act, they can permit the minor to withdraw his/her application for admission[28] and the minor can voluntarily return to his/her country of nationality or last habitual residence.

The TVPRA contains specific safeguards for the treatment of UAC while in the care and custody of CBP, and it provides guidance for CBP personnel on returning a minor to his/her country of nationality or last habitual residence. It also requires the Secretary of State to negotiate agreements with contiguous countries for the repatriation of their UAC. The agreements serve to protect children from trafficking and, at minimum, must include provisions that (1) ensure the handoff of the minor children to an appropriate government official; (2) prohibit returning UAC outside of "reasonable business hours"; and (3) require border personnel of the contiguous countries to be trained in the terms of the agreements.

As mentioned, UAC apprehended by the Border Patrol are brought to a Border Patrol facility, where they are processed. In 2008, the agency issued a memorandum entitled "Hold Rooms and Short Term Custody."[29] Since the issuance of this policy, non-governmental organizations (NGOs) have criticized the Border Patrol for failing to fully uphold provisions in current law and the *Flores Agreement*.[30] Indeed, the DHS Office of Inspector General (OIG) issued a report in 2010 concluding that while CBP was in general compliance with the *Flores Agreement*, it needed to improve its handling of UAC.[31]

The 2010 OIG report, however, did not address whether CBP was in compliance with the TVPRA. As highlighted above, the TVPRA requires CBP personnel to screen UAC from contiguous countries for severe forms of trafficking in persons *and* for fear of persecution if they are returned to their country of nationality or last habitual residence. At least one NGO that conducted a two-year study on UAC[32] asserted in its report that CBP does not adequately do this nor has it established related training for their Border Patrol agents.[33]

---

[27] P.L. 110-457, §235(a)(2)(A).

[28] Under the INA, apprehension at the border constitutes an application for admission to the United States. In this case, the UAC is permitted to return immediately to Mexico or Canada, and does not face administrative or other penalties. INA §235(a)(4); 8 U.S.C. §1225(a)(4).

[29] UAC are held in "hold rooms" at Border Patrol stations. The 2008 memorandum, which is publicly available but redacted, outlines agency policy on the care and treatment of individuals in CBP care and custody. See U.S. Customs and Border Patrol, Memorandum on "Hold Rooms and Short Term Custody," June 2, 2008, http://foiarr.cbp.gov/ streamingWord.asp?i=378, accessed by CRS on January 10, 2017.

[30] See for example, *Children at the Border: The Screening, Protection and Repatriation of Unaccompanied Mexican Minors*, by Betsy Cavendish and Maru Cortazar, Appleseed, Washington DC, 2011 (hereinafter referred to as *Children at the Border*).

[31] Department of Homeland Security, Office of Inspector General, *CBP's Handling of Unaccompanied Alien Children*, OIG-10-117, Washington, DC, September 2010.

[32] *Children at the Border*.

[33] Relatedly, the 2010 OIG study was unable to determine whether CBP personnel had sufficient training to comply with the provisions in the *Flores Agreement*. Notably, the Appleseed study (*Children at the Border*) included site visits to *ten* Border Patrol facilities as well as site visits to locales in Mexico and interviews with government officials in both countries and minors in custody and who have been repatriated. Whether this limited site visit sample is sufficiently varied to be adequately generalizable to all Border Patrol facilities on the U.S.-Mexico border is unclear.

## Immigration and Customs Enforcement

ICE is responsible for physically transferring UAC from CBP to ORR custody. ICE also may apprehend UAC in the U.S. interior during immigration enforcement actions. In addition, ICE represents the government in removal procedures before EOIR. Unaccompanied alien children who are not subject to TVPRA's special repatriation procedures for some children from Mexico or Canada (i.e., voluntary departure) may be placed in standard removal proceedings pursuant to INA Section 240. The TVPRA specifies that in standard removal proceedings, UAC are eligible for voluntary departure under INA Section 240B at no cost to the child.

ICE is also responsible for the physical removal of all foreign nationals, including UAC who have final orders of removal or who have elected voluntary departure while in removal proceedings. To safeguard the welfare of all UAC, ICE has established policies for repatriating UAC, including

- returning UAC only during daylight hours;
- recording transfers by ensuring that receiving government officials or designees sign for custody;
- returning UAC through a port designated for repatriation;
- providing UAC the opportunity to communicate with a consular official prior to departure for the home country; and
- preserving the unity of families during removal.[34]

ICE notifies the country of every foreign national being removed from the United States.[35] Implementing a removal order depends on whether the U.S. government can secure travel documents for the alien being removed from the country in question.[36] As such, the United States depends on the willingness of foreign governments to accept the return of their nationals. Each country sets its own documentary requirements for repatriation of their nationals.[37] While some allow ICE to use a valid passport to remove an alien (if the alien possesses one), others require ICE to obtain a travel document specifically for the repatriation.[38] According to one report, the process of obtaining travel documents can become problematic, because countries often change their documentary requirements or raise objections to a juvenile's return.[39]

Once the foreign country has issued travel documents, ICE arranges the UAC's transport. If the return involves flying, ICE personnel accompany the UAC to his or her home country. ICE uses commercial airlines for most UAC removals. ICE provides two escort officers for each UAC.[40] Mexican UAC are repatriated in accordance with Local Repatriation Agreements (LRA), which

---

[34] Email from ICE Congressional Relations, May 16, 2014.

[35] ICE uses a country clearance to notify a foreign country, through a U.S. Embassy abroad, that a foreign national is being repatriated. In addition, when ICE personnel escort the alien during his or her repatriation, the country clearance process notifies the U.S. Ambassador abroad that U.S. government employees will be travelling to the country.

[36] Conversation with Doug Henkel, Associate Director, ICE Removal and Management Division, February 20, 2012.

[37] Depending on the country and depending on where the UAC is housed, the consular officers will conduct in-person or phone interviews. Olga Byrne and Elise Miller, *The Flow of Unaccompanied Children Through the Immigration System,* Vera Institute of Justice, Washington, DC, March 2012, p. 27 (hereinafter referred to as *The Flow of Unaccompanied Children*).

[38] Annex 9 of the Civil Aviation Convention requires that countries issue travel documents, but the convention lacks an enforcement mechanism.

[39] *The Flow of Unaccompanied Children,* p. 27.

[40] An additional officer is added for each group that exceeds five UAC. The gender of the officers corresponds to the gender of the children repatriated. Email from ICE Congressional Relations, May 16, 2014.

require that ICE notify the Mexican Consulate for each UAC repatriated. Additional specific requirements apply to each LRA (e.g., specific hours of repatriation).[41]

## Office of Refugee Resettlement

The Unaccompanied Alien Children Program in ORR/HHS provides for the custody and care of unaccompanied alien minors who have been apprehended by ICE or CBP or referred by other federal agencies. The TVPRA directed that HHS ensure that UAC "be promptly placed in the least restrictive setting that is in the best interest of the child."[42] The HSA requires that ORR develop a plan to ensure the timely appointment of legal counsel for each UAC, ensure that the interests of the child are considered in decisions and actions relating to the care and custody of a UAC, and oversee the infrastructure and personnel of UAC residential facilities, among other responsibilities.[43] ORR also screens each UAC to determine if the child has been a victim of a severe form of trafficking in persons, if there is credible evidence that the child would be at risk if he or she were returned to his/her country of nationality or last habitual residence, and if the child has a possible claim to asylum.[44]

ORR arranges to house the child either in one of its shelters or in foster care; or the UAC program reunites the child with a family member. According to ORR, the majority of the youth are cared for initially through a network of state-licensed, ORR-funded care providers that offer classroom education, mental and medical health services, case management, and socialization and recreation. ORR oversees different types of shelters to accommodate unaccompanied children with different circumstances, including nonsecure shelter care, secure care, and transitional foster care facilities.[45] A juvenile may be held in a secure facility only if he or she is charged with criminal or delinquent actions, threatens or commits violence, displays unacceptably disruptive conduct in a shelter, presents an escape risk, is in danger and is detained for his/her own safety, or is part of an emergency or influx of minors that results in insufficient bed space at nonsecure facilities.[46]

The same care providers also facilitate the release of UAC to family members or other sponsors who are able to care for them.[47] The *Flores Agreement* outlines the following preference ranking for sponsor types: (1) a parent; (2) a legal guardian; (3) an adult relative; (4) an adult individual or entity designated by the child's parent or legal guardian; (5) a licensed program willing to accept legal custody; or (6) an adult or entity approved by ORR.[48]

---

[41] Ibid.

[42] §§235(a)-235(d) of TVPRA; 8 U.S.C. §1232(b)(2).

[43] Section 235(c) of the TVPRA and Section 462(b) of the Homeland Security Act of 2002 (HSA, P.L. 107-296) describe conditions for the care and placement of UAC in federal custody.

[44] As noted previously, all UAC are initially screened by CBP for trafficking victimization or risk as well as possible claims to asylum, regardless of country of origin.

[45] Shelter care refers to a minimally restrictive level of care, for most UAC without special needs. Secure care facilities are generally reserved for children with behavioral issues, a history of violent offenses or who pose a threat to themselves or others. Transitional foster care, which involves placement with families, is prioritized for children under age 13, sibling groups with one child younger than 13, pregnant and parenting teens, and children with special needs, including mental health needs. CRS briefing on unaccompanied children with ORR, May 5, 2014.

[46] *Flores v. Meese—Stipulated Settlement Agreement* (U.S. District Court, Central District of California, 1997), Exhibit 2.

[47] Administration for Children and Families, *Office of Refugee Resettlement, Unaccompanied Alien Children Program*, U.S. Department of Health and Human Services, Fact Sheet, January 2016, (hereinafter referred to as *ORR UAC Fact Sheet*, January 2016.)

[48] *Flores v. Meese—Stipulated Settlement Agreement* (U.S. District Court, Central District of California, 1997), p. 10.

In making these placement determinations, ORR conducts a background investigation to ensure the identity of the adult assuming legal guardianship for the UAC and that the adult does not have a record of abusive behavior. ORR may consult with the consulate of the UAC's country of origin as well as interview the UAC to ensure he or she also agrees with the proposed placement. If such background checks reveal evidence of actual or potential abuse or trafficking, ORR may require a home study as an additional precaution.[49] In addition, the parent or guardian is required to complete a Parent Reunification Packet to attest that they agree to take responsibility for the UAC and provide him/her with proper care.[50]

**Figure 2** shows both annual UAC apprehensions and annual referrals of unaccompanied children to ORR since FY2008. As expected, a positive relationship exists between the two measures, but in recent years, as children from non-contiguous countries have dominated the share of all UAC apprehensions, the correspondence between apprehensions and referrals has increased. In FY2009, when unaccompanied children from the three Northern Triangle countries comprised 17% of all UAC apprehensions, the proportion of children referred to ORR was 34% of total apprehensions. In FY2016, when unaccompanied children from those countries dominated the flow with 80% of all UAC apprehensions, the proportion referred to ORR was 99%.

**Figure 2. UACs Apprehended and Referred to ORR Custody, FY2008 - FY2016**



**Source: Apprehensions:** See sources for Figure 1 above; **Referrals:** FY2008-FY2015: ORR, Fiscal Year 2017, Administration for Children and Families, *Justification of Estimates for Appropriations Committees*, p. 243; FY2016: CRS presentation of unpublished data from the HHS Office of Refugee Resettlement.

---

[49] A home study is an in-depth investigation of the potential sponsor's ability to ensure the child's safety and well-being and involves background checks of both the sponsor and any adult household members, one or more home visits, a face-to-face interview with the sponsor and potentially with other household members, and post-release services. Pursuant to the TVPRA of 2008, home studies are required for certain UAC considered especially vulnerable.

[50] Office of Refugee Resettlement, Unaccompanied Children's Services, *ORR/DCS Family Reunification Packet for Sponsors (English/Español)*, http://www.acf.hhs.gov/programs/orr/resource/unaccompanied-childrens-services#Family%20Reunification%20Packet%20for%20Sponsors, accessed by CRS on January 10, 2017.

ORR reports that most children served are reunified with family members.[51] Between FY2008 and FY2010, the length of stay in ORR care averaged 61 days and total time in custody ranged from less than 1 day to 710 days.[52] ORR reported that children spent about 34 days on average in the program as of January 2016.[53] Removal proceedings continue even when UAC are placed with parents or other relatives.[54] As noted above, not all UAC are referred to ORR; for instance, many UAC from contiguous countries voluntarily return home.

The sizable increases in UAC referrals since FY2008 have challenged ORR to meet the demand for its services while maintaining related child welfare protocols and administrative standards.[55] These challenges reached a crescendo in January 2016 when a Senate investigation indicated that in FY2014, some UAC who had originally been placed with distant relatives and parentally-approved guardians ended up being forced to work in oppressive conditions on an Ohio farm.[56] The report outlined a range of what it characterized as serious deficiencies related to the safe placement of children with distant relatives and unrelated adults as well as post-placement follow-up. During the Senate Homeland Security Committee hearing that followed, HHS officials acknowledged limitations of their screening and post-placement follow-up procedures for such sponsors. They also reiterated the legal basis for the termination of UAC custody and HHS liability once custody of the unaccompanied minor was handed over to the sponsor.[57]

## U.S. Citizenship and Immigration Services

As mentioned, U.S. Citizenship and Immigration Services (USCIS) is responsible for the initial adjudication of asylum applications filed by UAC.[58] If either CBP or ICE finds that the child is a UAC and transfers him/her to ORR custody, USCIS generally will take jurisdiction over any asylum application, even where evidence shows that the child reunited with a parent or legal guardian after CBP or ICE made the UAC determination. USCIS also has initial jurisdiction over

---

[51] In FY2014, 96% of discharged UAC were released to a sponsoring family member. Of this group 58% were parents or legal guardians, 29% were other relatives, and 9% were non-relatives. The remaining 4% of UAC were discharged for other reasons, such as a transfer to DHS due to aging-out of UAC status. Source: unpublished data provided to CRS by Office of Legislative Affairs, Administration for Children and Families, Office of Refugee Resettlement, U.S. Department of Health and Human Services, March 20, 2015.

[52] *The Flow of Unaccompanied Children*, p. 17.

[53] *ORR UAC Fact Sheet*, January 2016. An earlier May 2014 version of this fact sheet cited an average of 35 days.

[54] Some communities and states have objected to unaccompanied children being located in their jurisdictions (either in shelters or in family placements) as well as the lack of notification by ORR. For more information, see U.S. Congress, House Committee on the Judiciary, Subcommittee on Immigration and Border Security, *Impact on Local Communities of the Release of Unaccompanied Alien Minors and the Need for Consultation and Notification*, 113th Cong., 2nd sess., December 10, 2014.

[55] A recent report by the Government Accountability Office (GAO) raised concerns about ORR's lack of a planning process for its capacity needs, inconsistent monitoring of service provision by its nonprofit grantee organizations that provide shelter services, limited contact with children following their placement, and administrative recording of post-placement follow-up procedures. See U.S. Government Accountability Office, *Unaccompanied Children: HHS Can Take Futher Actions to Monitor Their Care*, GAO-16-180, February 2016.

[56] United States Senate, Committee on Homeland Security and Governmental Affairs, Permanent Subcommittee on Investigations, *Protecting Unaccompanied Alien Children from Trafficking and Other Abuses: The Role of the Office of Refugee Resettlement*, January 28, 2016.

[57] U.S. Congress, Senate Committee on Homeland Security and Governmental Affairs, Permanent Subcommittee on Investigations, *Adequacy of the Department of Health and Human Services' Efforts to Protect Unaccompanied Alien Children From Human Trafficking*, 114th Cong., 2nd sess., January 28, 2016.

[58] For information on UAC and asylum, see archived CRS Report R43664, *Asylum Policies for Unaccompanied Children Compared with Expedited Removal Policies for Unauthorized Adults: In Brief*.

asylum applications filed by UAC with pending claims in immigration court, with cases on appeal before the Board of Immigration Appeals, or with petitions under review with federal courts as of enactment of the TVPRA (December 23, 2008). UAC must appear at any hearings scheduled in immigration court, even after petitioning for asylum with USCIS.

## The Executive Office for Immigration Review

The Executive Office for Immigration Review (EOIR) within the U.S. Department of Justice is responsible for adjudicating immigration cases and conducting removal proceedings. Generally, during an immigration removal proceeding, the foreign national and the U.S. government present testimony so that the immigration judge can make a determination on whether the foreign national is removable or qualifies for some type of relief from removal (i.e., the alien is permitted to remain in the United States either permanently or temporarily). The TVPRA requires that HHS ensure, to the greatest extent possible, that UAC have access to legal counsel, and it also permits HHS to appoint independent child advocates for child trafficking victims and other vulnerable unaccompanied alien children.

EOIR has specific policies for conducting removal hearings of UAC to ensure that UAC understand the nature of the proceedings, can effectively present evidence about their cases, and have appropriate assistance. The policy guidelines discuss possible adjustments to create "an atmosphere in which the child is better able to present a claim and to participate more fully in the proceedings." Under these guidelines, immigration judges should:

- establish special dockets for UAC that are separated from the general population;
- allow child-friendly courtroom modifications (e.g., judges not wearing robes, allowing the child to have a toy, permitting the child to testify from a seat rather than the witness stand, allowing more breaks during the proceedings);
- provide courtroom orientations to familiarize the child with the court;
- explain the proceedings at the outset;
- prepare the child to testify;
- employ child-sensitive questioning; and,
- strongly encourage the use of pro bono legal representation if the child is not represented.

On July 9, 2014, in response to the UAC surge, EOIR issued new guidelines that prioritized unaccompanied children and non-detained families above other cases in the immigration courts and on the same level as detained aliens.[59] On July 18, 2014, EOIR initiated a new case recording system that coincided with its announcement of its revised adjudication priorities.[60] The new system allows EOIR to track legal outcomes of UAC with greater precision.[61]

---

[59] Immigration and children's advocacy groups have criticized these policies for rushing the adjudication process. See for example, Wendy Feliz, "Immigration Courts Are Ordering Unrepresented Children Deported," *Immigration Impact*, March 10, 2015; and Walter Ewing, "Why More Immigration Judges Are Needed," *Immigration Impact*, May 11, 2015. See also U.S. Congress, House Committee on the Judiciary, Subcommittee on Immigration and Border Security, *Oversight of the Executive Office for Immigration Review*, statement of Ranking Member Zoe Lofgren, 114th Cong., 1st sess., December 3, 2015, pp. 34-35.

[60] The four priority categories are: 1) unaccompanied child; 2) adults with a child or children detained; 3) adults with a child or children released on alternatives to detention; and 4) recently detained border crossers. See statement of Juan P. Osuna, Director of Executive Office of Immigration Review, U.S. Department of Justice, *The President's Emergency Supplemental Request for Unaccompanied Children and Related Matters*, in U.S. Congress, Senate Committee on (continued...)

CRS reviewed almost two years of EOIR data covering July 18, 2014 through June 28, 2016.[62] Of the 69,540 UAC who were given Notices to Appear (NTA)[63] by DHS over this period, 55,793 had at least one master calendar ("scheduling") hearing. Of the total cases scheduled, EOIR classified 31,091 as completed. Of the total completed cases, 12,977 resulted in removal orders, of which 11,528 (89%) were issued *in absentia*, meaning that the UAC had not shown up to the hearing. Of the other total completed cases that did not result in a removal order, 7,799 were terminated,[64] 906 resulted in voluntary departure,[65] 8,846 were administratively closed,[66] and 477 resulted in other administrative outcomes[67] (Table 1).

### Table 1. UAC Initial Case Completion by Outcome and Legal Representation
(July 18, 2014, through June 28, 2016)

| Outcome | Total | | With Legal Representation | | Without Legal Representation | |
|---|---|---|---|---|---|---|
| | Cases | % of Total | Cases | % of Total | Cases | % of Total |
| Removal | 12,977 | 41.7% | 2,583 | 13.4% | 10,394 | 88.2% |
| Termination | 7,799 | 25.1% | 7,317 | 37.9% | 482 | 4.1% |
| Voluntary Departure | 906 | 2.9% | 619 | 3.2% | 287 | 2.4% |
| Administrative Closure | 8,846 | 28.5% | 8,277 | 42.9% | 569 | 4.8% |
| Other Administrative Outcome | 477 | 1.5% | 431 | 2.2% | 46 | 0.4% |
| Immigration Relief | 86 | 0.3% | 83 | 0.4% | 3 | 0.0% |
| Total | 31,091 | 100.0% | 19,310 | 100.0% | 11,781 | 100.0% |

**Source:** Executive Office for Immigration Review, Unaccompanied Children Priority Code Adjudication, July 18, 2014-June 28, 2016, unpublished data provided to CRS, August 31, 2016.

**Notes:** Numbers may not sum to totals presented because of rounding.

Outcomes varied considerably depending upon whether children received legal representation. Of the 11,781 children without legal representation, 10,394 (or 88.2%) were ordered removed. Of the 19,310 children with legal representation, 2,583 (or 13.4%) were ordered removed. Cases that did

---

Appropriations, hearings, 113th Cong., 2nd sess., July 10, 2014.

[61] Prior to this system, EOIR tracked only the number of juveniles it processed and could not distinguish between UAC and other minors.

[62] Executive Office for Immigration Review, Unaccompanied Children Priority Code Adjudication, July 18, 2014-June 28, 2016, unpublished data provided to CRS, August 31, 2016.

[63] A *Notice to Appear* is a charging document that initiates immigration removal proceedings.

[64] A case termination refers to a decision by an immigration judge to dismiss the case associated with a particular charging document. The conventional charging document given to a UAC who is put into removal proceedings is the *Notice to Appear*. If a case is terminated in this situation, the child is not subject to removal related to the dismissed charging document. If DHS choses to subsequently pursue the case, it must issue a new charging document.

[65] A UAC may elect to leave the United States voluntarily at any point during his or her removal proceedings. For more information on voluntary departure, see CRS Report R43892, *Alien Removals and Returns: Overview and Trends*.

[66] An administrative closing refers to the temporary removal of a case from an immigration judge's calendar or docket by the court. If DHS choses to pursue the case, it may ultimately be placed back on the judge's calendar or docket.

[67] According to EOIR, other administrative outcomes refers to "administrative closure for reasons other than prosecutorial discretion, by joint motion or otherwise in accordance with applicable precedent decisions of the Board nf Immigration Appeals (BIA)." An example could include a change of venue at a more advanced stage of the case.

not result in a removal order concluded by children having their cases administratively closed or terminated. In 86 cases (0.3% of all initial case completions for this period), children received some form of immigration relief. Generally, the most usual forms of immigration relief for UAC include asylum, special immigrant juvenile status for abused, neglected, or abandoned children who are declared dependent by state juvenile courts[68] and "T nonimmigrant status" for victims of trafficking.[69]

# Administrative and Congressional Action

The Obama Administration and Congress have both taken action since 2014 to respond to the UAC surge. The Administration developed a working group to coordinate the efforts of the various agencies involved in responding to the issue, temporarily opened additional shelters and holding facilities to accommodate the large number of UAC apprehended at the border, initiated programs to address root causes of child migration in Central America, and requested funding from Congress to deal with the crisis. In turn, Congress considered supplemental appropriations for FY2014 and increased funding for UAC-related activities in ORR and DHS appropriations for subsequent fiscal years.

## Administrative Action

In response to the UAC surge, the Obama Administration announced in June 2014 that it had developed a Unified Coordination Group comprised of representatives from key agencies and headed by the Administrator of the Federal Emergency Management Agency (FEMA), Craig Fugate.[70] The FEMA administrator's role was to "lead and coordinate Federal response efforts to ensure that Federal agency authorities and the resources granted to the departments and agencies under Federal law … are unified in providing humanitarian relief to the affected children, including housing, care, medical treatment, and transportation."[71]

From the outset, CBP maintained primary responsibility for border security operations at and between ports of entry and, working with ICE, provided for the care of unaccompanied children in temporary DHS custody.[72] DHS coordinated with the Departments of Health and Human Services, State, and Defense, as well as the General Services Administration and other agencies, to ensure a coordinated and prompt response within the United States in the short term, and in the longer term to work with migrant-sending countries to undertake reforms to address the causes behind the recent flows.[73] In June 2014, DHS initiated a program to work with the Central

---

[68] For more information, see CRS Report R43703, *Special Immigrant Juveniles: In Brief.*

[69] For more information, see CRS Report RL34317, *Trafficking in Persons: U.S. Policy and Issues for Congress.*

[70] Department of Homeland Security, "Statement by Secretary Johnson on Increased Influx of Unaccompanied Immigrant Children at the Border," press release, June 2, 2014; and Alejandro Mayorkas, Deputy Secretary of the Department of Homeland Security, "Press Call Regarding the Establishment of the Inter-Agency Unified Coordination Group on Unaccompanied Alien Children," press release, June 3, 2014.

[71] The White House, Office of the Press Secretary, "Presidential Memorandum – Response to the Influx of Unaccompanied Alien Children Across the Southwest Border" press release, June 2, 2014.

[72] As one of its missions, ICE works to dismantle organizations that smuggle UAC into the United States.

[73] Department of Homeland Security, "Statement by Secretary Johnson on Increased Influx of Unaccompanied Immigrant Children at the Border," press release, June 2, 2014.

American countries on a public education campaign to dissuade UAC from attempting to migrate illegally to the United States.[74]

To manage the influx of UAC, ORR used group homes operated by nonprofit organizations with experience providing UAC-oriented services (e.g., medical attention, education). HHS also coordinated with the Department of Defense (DOD), which temporarily made facilities available for UAC housing at Lackland Air Force Base in San Antonio, TX, and at Naval Base Ventura County in Oxnard, CA. Arrangements at both sites ended August 2014.[75]

To address the legal needs of large numbers of children entering the immigration court system, the Corporation for National and Community Service (CNCS), which administers AmeriCorps,[76] partnered with EOIR to create "Justice AmeriCorps," a grant program that enrolled approximately 100 lawyers and paralegals as AmeriCorps members to provide UAC with legal representation during removal proceedings.[77]

DOJ's Office of Legal Access Programs established the Legal Orientation Program for Custodians of Unaccompanied Children (LOPC), the goals of which are "to improve the appearance rates of non-detained children at their immigration court hearings, and to protect children from mistreatment, exploitation, and trafficking by increasing access to legal and other services." In FY2014 the LOPC served over 12,000 custodians for children released from ORR custody.[78] The LOPC operates a national call center that provides scheduling assistance and basic legal information to UAC custodians.[79] Additional Administration initiatives include partnering with Central American governments to combat gang violence, strengthen citizen security, spur economic development, and support the reintegration and repatriation of returned citizens.[80] The Administration also initiated a collaborative information campaign with Central American governments to inform would-be migrants on a variety of issues.[81]

## Congressional Action

As the UAC crisis unfolded in 2014, congressional attention initially focused on whether the various agencies responding to it had adequate funding. As the crisis began to wane, congressional attention shifted to mechanisms to prevent such a surge from reoccurring.

---

[74] Alejandro Mayorkas, Deputy Secretary of the Department of Homeland Security, "Press Call Regarding the Establishment of the Inter-Agency Unified Coordination Group on Unaccompanied Alien Children," press release, June 3, 2014.

[75] Leslie Berestein Rojas, "Emergency Shelter for Unaccompanied Migrant Kids Opening in Ventura County," *89.3 KPCC, Southern California Public Radio*, June 5, 2014.

[76] For more information on the CNCS and AmeriCorps, see CRS Report RL33931, *The Corporation for National and Community Service: Overview of Programs and Funding.*

[77] Department of Justice and the Corporation for National and Community Service, "Justice Department and CNCS Announce New Partnership to Enhance Immigration Courts and Provide Critical Legal Assistance to Unaccompanied Minors," press release, June 6, 2014.

[78] FY2014 information is the most recent available as of April 29, 2016. See United States Department of Justice, Administrative Review and Appeals, *FY 2017 Performance Budget Congressional Budget Submission*, p.4.

[79] Ibid, pp. 3-4.

[80] White House, Office of the Press Secretary, "Fact Sheet: Unaccompanied Children from Central America."

[81] Ibid.

## Appropriations

In the Obama Administration's original FY2015 budget that was released in March 2014 for the agencies directly responsible for the UAC population (i.e., within ORR and DHS budgets), no funding increases were requested to help address the UAC surge. However, on May 30, 2014, the Office of Management and Budget updated its cost projections for addressing the growing UAC population and requested $2.28 billion for FY2015 for ORR's UAC program and $166 million for DHS for CBP overtime, contract services for care and support of UAC, and transportation costs.[82]

On July 8, 2014, the Administration requested a $3.7 billion supplemental appropriation, almost all of which was directly related to addressing the UAC surge, including $433 million for CBP, $1.1 billion for ICE, $1.8 billion for HHS, $64 million for the Department of Justice (DOJ), and $300 million for the Department of State (DOS).[83] On July 23, 2014, Senator Mikulski introduced the Emergency Supplemental Act, 2014 (S. 2648) which, among other provisions, would have provided supplemental funding of $1.2 billion to HHS's Administration for Children and Families' Refugee and Entrant Assistance Program; $320.5 million and $22.1 million, respectively, for CBP and CBP's air and marine operations; and $762.8 million to ICE for transportation and enforcement and removal costs. S. 2648 would have appropriated $124.5 million to DOJ for court activities related to UAC processing, and $300 million to DOS's and the U.S. Agency for International Development's (USAID's) unaccompanied alien-related activities, the same amount the Administration requested. Congress did not pass S. 2648.

In December 2014, the Consolidated and Further Continuing Appropriations Act, 2015 (P.L. 113-235) provided nearly $1.6 billion for ORR's Refugee and Entrant Assistance Programs for FY2015, with the expectation that most of these funds would be directed toward the UAC program.[84] In addition, P.L. 113-235 included a new provision allowing HHS to augment appropriations for the Refugee and Entrant Assistance account by up to 10% through transfers from other discretionary HHS funds.[85]

In March 2015, the Department of Homeland Security Appropriations Act, 2015 (P.L. 114-4) provided $3.4 billion to ICE for detection, enforcement, and removal operations, including $23.7 million for the transport of unaccompanied children for CBP. The act required that DHS estimate FY2015 UAC apprehensions and the number of necessary agent or officer hours and related costs. It also provided for budgetary flexibility through the optional reprogramming of funds.[86]

In its FY2016 budget, the Obama Administration requested contingency funding as well as base funding for several agencies in the event of another surge of unaccompanied children. For ORR's

---

[82] Executive Office of the President, Office of Management and Budget, Memorandum to Representative Nita Lowey, May 30, 2014.

[83] The White House, "Fact Sheet: Emergency Supplemental Request to Address the Increase in Child and Adult Migration from Central America in the Rio Grande Valley Areas of the Southwest Border," press release, July 8, 2014.

[84] In addition to the UAC program, the Refugee and Entrant Assistance Program administers the following programs: Transitional/Cash and Medical Services, Victims of Trafficking, Social Services, Victims of Torture, Preventive Health, and Targeted Assistance. For additional information, see CRS Report RL31269, *Refugee Admissions and Resettlement Policy.*

[85] This paragraph was excerpted from CRS Report R43967, *Labor, Health and Human Services, and Education: FY2015 Appropriations.*

[86] Section 571 of the act permitted the Secretary to reprogram funds within CBP and ICE and transfer such funds into the two agencies' "Salaries and Expenses" accounts for the care and transportation of UAC. Section 572 of the act allowed for State Homeland Security Program and Urban Area Security Initiative grants that are awarded to states along the Southwest border to be used by recipients for costs or reimbursement of costs for providing humanitarian relief to unaccompanied children.

Unaccompanied Children Program (within the Refugee and Entrant Assistance Program), the Administration requested $948 million for base funding (the same as FY2015) and $19 million for contingency funding.[87] Congress met the base funding request but appropriated no monies for contingency funding.

For FY2016 DHS funding, the Administration requested $203.2 million in base funding and $24.4 million in contingency funding for CBP for costs associated with the apprehension and care of unaccompanied children.[88] The Administration requested $2.6 million in contingency funding for ICE to be used for transportation costs associated with UAC apprehensions if such apprehensions exceeded those in FY2015.[89] Neither the Senate[90] nor the House[91] committee-reported FY2016 DHS appropriations bills would have funded these requests. For DOJ, the Administration requested an additional $50 million (two-year funding) for EOIR to process UAC.[92] Congress provided CBP with $204.9 million in base funding but not the contingency funding requested. Congress provided ICE with $24.3 million in UAC transportation funding but not the contingency transportation request.[93]

For FY2017, within the Administration's $2.185 billion Refugee and Entrant Assistance request, the Administration requested $1,321 million for unaccompanied children that included $1,226 million in base funding and contingency funding which if triggered by larger than expected caseloads, would start at $95 million and expand to $400 million.[94] For UAC operations within DHS, the Administration requested $13.2 million for ICE's Transportation and Removal Program, including $3 million in contingency funding; and $217.4 million for CBP, including $5.4 million in contingency funding.

Congress, in turn, has passed two continuing resolutions (CRs) to fund ORR for FY2017. Congress first passed the Continuing Appropriations and Military Construction, Veterans Affairs, and Related Agencies Appropriations Act, 2017, and the Zika Response and Preparedness Act (P.L. 114-223), which funded ORR from October 1, 2016, through December 9, 2016, at the same level and under the same conditions as FY2016, less an across-the-board reduction of 0.496%. Under the terms of the CR, HHS retained its authority to augment this account by up to 10% using transfers from other HHS accounts. HHS reportedly used this authority to transfer $167 million into the account in November 2016, due to a surge in the UAC caseload.[95]

---

[87] Department of Health and Human Services, Administration for Children and Families, *Fiscal Year 2016, Justification of Estimates for Appropriations Committees*, p. 21.

[88] The total CBP contingency request was for $134.5 million for costs associated with the apprehension and care of up to 104,000 UAC. Based on the anticipated low probability of such a high number of UAC apprehensions, the FY2016 budget scored the requested increase at $24.4 million.

[89] Base funding for ICE to transport UAC was not separated out from other transportation activities within the budget. The total ICE contingency request was for $27.6 million for costs associated with transportation of up to 104,000 UAC. Based on the anticipated low probability of such a high number of UAC requiring such transportation, the FY2016 budget scored the requested increase at $2.6 million.

[90] S. 1619, S.Rept. 114-68.

[91] H.R. 3128, H.Rept. 114-215.

[92] See U.S. Department of Homeland Security, *FY2016 Congressional Budget Justification*, U.S. Department of Justice, Administrative Review and Appeals, Executive Office for Immigration Review (EOIR), *FY2016 Congressional Budget Justification*; Department of Health and Human Services, Administration for Children and Families, *Fiscal Year 2016, Justification of Estimates for Appropriations Committees*.

[93] See U.S. Department of Homeland Security, *FY2017 Congressional Budget Justification*.

[94] Department of Health and Human Services, Administration for Children and Families, *Fiscal Year 2017, Justification of Estimates for Appropriations Committee*, p. 237.

[95] Letter from Sylvia M. Burwell, Secretary of Health and Human Services, to the Honorable Roy Blunt, Chairman of (continued...)

Prior to congressional consideration of a second CR, the Administration requested that any new CR include a provision providing a higher operating level for the Refugee and Entrant Assistance account. This stems from an increased caseload resulting from the growth in the number of unaccompanied children from Central American countries who have been apprehended at the U.S.-Mexico border. The Administration requested funding for the account at an annual rate of $3.874 billion, of which $2.823 billion would be used for unaccompanied children. However, the Administration separately noted that it might be possible to meet caseload demands at a lower level than requested, indicating that at a minimum this would require $500 million for the Refugee and Entrant Assistance account, of which $430 million would be used for unaccompanied children, as well as additional transfer authority in the event of higher than anticipated costs.[96]

More recently, Congress passed a second FY2017 CR, the Further Continuing and Security Assistance Appropriations Act, 2017 (P.L. 114-254), which funds most federal agencies through April 28, 2017.[97] The second FY2017 CR generally funds ORR programs at the same level and under the same conditions as in FY2016, minus an across-the-board reduction of 0.1901%.[98] However, this CR also contains a special provision authorizing HHS to transfer additional funds into the Refugee and Entrant Assistance account to support the UAC program under certain circumstances. Specifically, the CR authorizes HHS to transfer $300 million to fund ORR programs dedicated to unaccompanied children as of February 1, 2017.[99] After March 1, 2017, if the UAC caseload for FY2017 exceeds by 40% or more the UAC caseload for the comparable period in FY2016, the CR would appropriate an additional $200 million in new funding.

# Going Forward

In response to the UAC surge in the spring and summer of 2014, the Administration announced initiatives to unify efforts among federal agencies with UAC responsibilities and to address the situation with programs geared toward unaccompanied children from several Central American countries. Additionally, Congress increased funding for the HHS program responsible for the care of unaccompanied children, and permitted the Secretary of DHS to transfer funds from within a specific CBP and ICE account for the care and transportation of unaccompanied children, among other actions taken. Since FY2014, the Administration has continued to request additional funding for programs geared toward unaccompanied children, and Congress has appropriated for some but not all such requests.

---

(...continued)

the Labor, Health and Human Services, Education, and Related Agencies Subcommittee of the Senate Committee on Appropriations, November 9, 2016, provided by HHS to CRS. The general HHS transfer authority provision is located in Division H, Title II, Section 205 of the Consolidated Appropriations Act, 2016 (P.L. 114-113).

[96] The Administration's anomaly requests for the second CR were based on the assumption that the CR would run through the end of March 2017, one month less than the duration of the CR that was ultimately enacted.

[97] H.R. 2028. An exception is that the agencies funded by the Military Construction, Veterans Affairs, and Related Agencies appropriations act already received full-year funding in P.L. 114-223.

[98] Further Continuing and Security Assistance Appropriations Act, 2017, §101(a)(2).

[99] See §170 of the CR (H.R. 2028). The CR specifies that this transfer comes from the HHS Nonrecurring Expenses Fund (NEF). The NEF was created by the Consolidated Appropriations Act, 2008 (P.L. 110-161, Division G, Title II, §223) to enable the HHS Secretary to collect certain unobligated balances of expired discretionary funds appropriated to HHS from the General Fund. Funds transferred into the NEF typically support capital acquisitions across HHS, such as facilities infrastructure and information technology. The FY2017 CR also includes a provision rescinding $100 million from the NEF (see §170(d).

Apprehensions of unaccompanied children rose substantially between FY2011 and FY2014 before declining considerably in FY2015. However, the increased number of apprehensions in FY2016 and the most recent apprehension data for the first few months of FY2017 suggest that the flow of unaccompanied children to the United States has not abated.

Once in the United States, the number of unaccompanied children who will ultimately qualify for asylum or other forms of immigration relief that may allow them to remain in the United States remains unclear. Many unaccompanied children have family members in the United States, many of whom may not be legally present. Such circumstances raise challenging policy questions that may pit what is in the "best interests of the child" against what is permissible under the Immigration and Nationality Act and other relevant laws.

## Author Contact Information

William A. Kandel
Analyst in Immigration Policy
wkandel@crs.loc.gov, 7-4703

# EXHIBIT F



FACT SHEET – March 2019

**SUBJECT:** Unaccompanied Alien Children Program

**ACF**

The Unaccompanied Alien Children (UAC) Program is managed by the Office of Refugee Resettlement (ORR) within the Administration for Children and Families, an operational division of the U.S. Department of Health and Human Services (HHS).

Current Law –

By law, the U.S. Department of Health and Human Services (HHS) has custody and must provide care for each UAC, defined as a child who has no lawful immigration status in the United States; has not attained 18 years of age; and, with respect to whom, there is no parent or legal guardian in the United States, or no parent or legal guardian in the United States available to provide care and physical custody. *See* 6 U.S.C. § 279(g)(2).

Program Foundation –

Under the Homeland Security Act of 2002, Congress transferred the care and custody of these children to ORR from the former Immigration and Naturalization Service (INS) to move away from the adult detention model. In the Trafficking Victims Protection Reauthorization Act of 2008, which expanded and redefined HHS's statutory responsibilities, Congress directed that each child must "be promptly placed in the least restrictive setting that is in the best interest of the child." *See* 8 U.S.C. § 1232(b)(2).

Program Development –

UAC are referred to ORR by another federal agency, usually the Department of Homeland Security. Most children are placed into ORR care because they were apprehended by immigration authorities while

trying to cross the border; others are referred after coming to the attention of immigration authorities at some point after crossing the border. HHS plays no role in the apprehension or initial detention of UAC prior to their referral to HHS custody and HHS is not a party to the child's immigration proceedings.

ORR has provided care for and found suitable sponsors for over 340,000 UAC. For its first nine years at ORR, fewer than 8000 children were served annually in this program. Since Fiscal Year 2012 (October 1, 2011 – September 30, 2012), this number has jumped dramatically, with a total of 13,625 children referred to ORR by the end of FY 2012. The program received 24,668 UAC referrals from DHS in FY 2013, 57,496 referrals in FY 2014, 33,726 referrals in FY 2015, 59,170 in FY 2016, and 40,810 in FY 2017. In FY 2018 49,100 UAC were referred. Because of the large fluctuations in arrival numbers throughout the year, ORR maintains a mix of "standard" beds that are available year-round, and "temporary" beds that can be added or reduced as needed. This bed management strategy provides the ability to accommodate changing flows.

In FY 2018, approximately 73 percent of all children referred were over 14 years of age, and over 71 percent were boys. In FY 2018, countries of origin of youth in this program were approximately as follows: Guatemala (54%); El Salvador (12%); Honduras (26%); and other (8%).

Today, HHS operates a network of just over 100 shelters in 17 states and has a proven track record of accountability and transparency for program operations, as well as being a good neighbor in the communities where shelters are located. In Q1 of FY 2019 the overall average length of care for UAC in the program was 89 days. The overwhelming majority of UAC are released to suitable sponsors who are family members within the United States (U.S.) to await immigration hearings.

All potential sponsors for UAC are required to undergo background checks and complete a sponsor assessment process that identifies risk factors and other potential safety concerns. As a part of the release process, all potential sponsors must undergo a criminal public records check and a sex offender registry check. ORR also conducts background checks on adult household members and individuals identified in a potential sponsor's care plan.  In addition ORR policy requires that all proposed UAC sponsors be fingerprinted to enhance the safety checks on potential sponsors and UAC home. The fingerprints are cross-checked with the Federal Bureau of Investigation's (FBI) national criminal history and state repository records and also includes a search of DHS arrest records. As of December 18, 2018 HHS no longer requires household members to submit to fingerprint background checks. ORR will continue to do public records checks on all adult household members to ensure child safety.

In some instances ORR also requires a home study before releasing a child. Home studies are mandatory for certain cases identified in law, including for: a child who is a victim of trafficking; a child with a disability; where the child has been a victim of physical or sexual abuse under circumstances that indicate that the child's health or welfare has been significantly harmed or threatened; and where the child's sponsor clearly presents a risk of abuse, maltreatment, exploitation or trafficking, to the child based on all available objective evidence. Additionally, per ORR policy, a home study is required for any child to a non-relative sponsor who is seeking to sponsor multiple children, or has previously sponsored or sought to sponsor a child and is seeking to sponsor additional children. ORR requires a home study for children who are 12 years and under before releasing to a non-relative sponsor.

Since the beginning of the program, ORR has notified Immigration and Customs Enforcement (ICE) 24 hours before and 24 hours after the release of all UAC. The notification includes the name of the sponsor and their current address.

Program Services -

Consistent with federal law, ORR places children while in ORR custody in the least restrictive setting that is in the best interest of the child, taking into account potential flight risk and danger to self and others. State-licensed ORR-funded facility services includes:

- Classroom education
- Mental and medical health services
- Case management
- Recreation
- Family reunification services that facilitate safe and timely release to family members or other sponsors who can care for them. We conduct home studies prior to release if safety is in question, and fund follow-up services for at-risk children after their release.

Program Responsibilities –

- Making and implementing placement decisions for the UAC
- Ensuring that the interests of the child are considered in decisions related to the care and custody of UAC
- Providing home assessments for certain categories of children
- Conducting follow-up services for certain categories of children
- Overseeing the infrastructure and personnel of ORR-funded care provider facilities
- Conducting on-site monitoring visits of ORR-funded care provider facilities and ensuring compliance with ORR national care standards
- Collecting, analyzing, and reporting statistical information on UAC
- Providing training to federal, state, and local officials who have substantive contact with UAC
- Developing procedures for age determinations and conducting these determinations
- Cooperating with the Department of Justice's Executive Office for Immigration Review to ensure that sponsors receive legal orientation presentations
- Ensuring, to the greatest extent practicable, that all UAC in custody have access to pro bono legal representation or counsel
- Releasing UAC to qualified sponsors and family members who are determined to be capable of providing for the child's physical and mental well-being

Updated: March 2019

# EXHIBIT G

# BuzzFeed News

REPORTING TO YOU

# "It's Hell There": This Is What It's Like For Immigrants Being Held In A Pen Underneath An El Paso Bridge

US immigration officials are holding hundreds of people in a temporary outdoor detention camp under a Texas bridge, where migrants are surrounded by fencing and sleeping on dirt.



**Adolfo Flores**
BuzzFeed News Reporter

Reporting From
**El Paso, Texas**

Last updated on March 30, 2019, at 12:30 p.m. ET
Posted on March 29, 2019, at 7:11 p.m. ET



Families are seen inside a temporary migrant holding area set up by Customs and Border Protection under the Paso del Norte International Port of Entry between Juarez, Mexico, and El Paso, March 27, 2019, in El Paso, Texas.
*Ivan Pierre Aguirre for BuzzFeed News*

EL PASO, Texas — Hundreds of migrants being held in an outdoor camp underneath a bridge that connects the US and Mexico told BuzzFeed News that had they known they'd face such harsh conditions at the Texas border before they left, they may not have made the journey.

The immigrants, held behind a chain-link fence topped with razor wire, said they've endured cold and windy nights sleeping on bare, rocky dirt underneath the Paso Del Norte International Bridge that links Ciudad Juarez and El Paso. Most of the immigrants had nothing but thin, mylar blankets. Above, roosting pigeons dropped feces on them.

US immigration officials said they have been overwhelmed by the influx of migrant families trying to enter the country, filling facilities to capacity, and forcing officials to

temporarily house people under the bridge in what they describe as a transitional shelter.

On Thursday morning, as cars and travelers went back and forth across the two border cities on the bridge above, a group of immigrant men and a young boy talked and pointed to the razor wire that encircled them. Behind them was a line of portable toilets. On the floor were the metallic-looking plastic blankets they were given to brave the shivering cold.

Reporters were able to view immigrants inside the pen for a brief time before Border Patrol agents asked that they leave the area. Several immigrants at a nearby Greyhound bus station said they spent nights under the bridge before they were released pending scheduled appearances before immigration judges.

N. Rosales, a woman from Honduras who crossed into the US with her son, spent about three days under the bridge until she was moved to a Border Patrol holding cell at the adjacent processing facility. She asked that her full name or age not be used, fearing retaliation from immigration authorities.

Officials installed a large tent underneath the bridge, but it wasn't large enough to hold everyone. Those who couldn't fit inside the tent slept outside on the ground littered with rocks, Rosales said. Whether they were inside or outside the tent, Rosales said people had to sleep on the gravel.

"It's Hell There": This Is What It's Like For Immigrants Being Held In A Pen Underneath An El ... Page 4 of 11



*Ivan Pierre Aguirre for BuzzFeed News*

Immigration agents would wake them up before sunrise for breakfast, she said.

"I see it as a punishment for entering the country illegally," Rosales told BuzzFeed News. "Time moved so slow, it seemed like an eternity."

Four other immigrants at the Greyhound station in El Paso who were waiting for a bus to Miami, Chicago, or Boston corroborated the description of the conditions, but declined to use their names out of fear of authorities.

Andrew Meehan, CBP assistant commissioner for public affairs, said Border Patrol had issued warnings for several months that "the immigration system is broken" and at "critical capacity levels" along the southern border.

"CBP's facilities and manpower cannot support this dramatic increase in apprehensions of family units and unaccompanied children," Meehan said in a statement to BuzzFeed News. "USBP temporary holding facilities were simply not designed to process and care for a population of this size and of this demographic."

Meehan said the number of families and children has forced CBP to seek every possible temporary solution to house, process, and care for people in their custody. The agency said it was providing full-time, onsite medical providers, as well as blankets, access to shower facilities, water, three meals a day with additional snacks, restrooms, and access to telephones.

Nearly every sector across the southwest border has exceeded their capacity, Meehan said. As a result Border Patrol has begun processing "non-criminal" families for immediate release under their own recognizance.

 **Adolfo Flores**
@aflores

Border Patrol facilities at or over 100% capacity: El Paso 283% - 3,426 in custody Rio Grande Valley 174% - 5,355 in custody Yuma 149% - 522 in custody Rio Grande Valley Centralized Processing Center 132% - 1,977 in custody RVG McAllen Station 358% - 1,369 in custody

04:23 PM - 30 Mar 2019

Reply     Retweet     Favorite

Roger Maier, a spokesperson for CBP, previously said officials set up the enclosure and tent underneath the

bridge because of the large number of apprehensions in the area.

"As illegal aliens arrive at the processing facility, they are placed at the 'tent' to await their turn to be processed," Maier said in a statement. "This tent serves only as a transitional shelter and is not a temporary housing facility. It was established within the last month."

The images of women, men, and children detained by authorities under the Paso del Norte Bridge were seen after Kevin McAleenan, the commissioner of CBP, held a press conference nearby to discuss the "unprecedented humanitarian crisis" the agency was facing as more unaccompanied minors and a record number of families arrive.

Immigration officials said they've been overwhelmed by the number of Central American children and families they are holding in facilities originally built to detain single Mexican immigrants.

In the past, CBP would turn over migrants apprehended at the border to Immigration and Customs Enforcement — but both agencies said they don't have the space to hold the number of people they're seeing at the border.

As a result, officials said, Border Patrol has been forced to directly release migrant families in Texas's Rio Grande Valley instead of waiting for ICE to pick them up. A Border Patrol official said the agency was planning to expand the practice of directly releasing migrant families to other

areas of the border in El Paso, Yuma, San Diego, and possibly Del Rio because of overcapacity at facilities.

M. Gonzalez, a Honduran who crossed the border with his teenage brother and asked that his full name not be used, said riding on "The Beast" — a system of freight trains migrants use to traverse Mexico quickly — was easier than the conditions they faced under the bridge. The train is infamous for the number of lives and limbs it has claimed from migrants who fall off or are attacked by criminals.

"It's hell there," Gonzalez told BuzzFeed News. "The bridge is one of the worst things I've ever experienced."

A young boy is seen under the Paso del Norte International Port of Entry between Juarez and El Paso.
*Ivan Pierre Aguirre / Ivan Pierre Aguirre*

Gonzalez, who spent about four days under the bridge, said the wind would funnel underneath it at night, making it

feel dramatically colder. Their lips would chap and crack, he said, pointing to the pieces of peeling skin on his lips.

Droppings from the pigeons perched on the inside of the bridge fell on detainees, he said. Gonzalez said kids were constantly crying and some looked like they were about to faint.

"I regretted coming," Gonzalez said. "I'm not sure I would've come if I had known."

During the days they could hear shouts from people they assumed were walking overhead.

"You're not alone."

"You're with God."

Others were less supportive.

"You're not welcomed."

"Go back to your country."

A pair of socks hang on the fence surrounding a temporary migrant holding area set up by CBP under the Paso del Norte International Port of Entry.
*Ivan Pierre Aguirre for BuzzFeed News*

Not everything was so horrible. The portable toilets were clean, the walls around them disinfected, and the water at the plastic portable sinks to wash their hands was refilled.

Rosales and Gonzalez said that before they made the journey to the US, they didn't hear from friends or family who had successfully entered about the conditions they faced in detention.

Rosales thinks people are too ashamed to describe their experience. Then again, she said, some migrants are so desperate that warnings about conditions in immigration detention would do little to stop them.

Gonzalez said he had been told by undocumented people in the US it was safe to make the journey and nothing bad would happen to him.

"They said they let people with children pass," Gonzalez said.

After spending days under the bridge, Gonzalez said he would be forthcoming with others back home about his journey.

"I'd tell people what it's like," he said. "If they want to risk it, that's on them."

*Ivan Pierre Aguirre*

**TOPICS IN THIS ARTICLE**

( Immigration )

 Adolfo Flores is a reporter for BuzzFeed News and is based in Los Angeles.

# EXHIBIT H



Written Testimony of:

**J. J. Mulligan Sepúlveda**

Clinical Fellow,
UC Davis School of Law
Immigration Law Clinic

Submitted to the:

U.S. House of Representatives
Committee on Appropriations
Subcommittee on Labor, Health and Human Services,
Education and Related Agencies

For a Hearing on:

Reviewing the Administration's Unaccompanied Children Program

February 27, 2019

Chairwoman DeLauro and Ranking Member Cole, thank you for the opportunity to testify before the subcommittee today. My name is J. J. Mulligan. I am the clinical fellow at UC Davis School of Law's Immigration Law Clinic and I am honored to be here representing the Immigration Law Clinic.

The Immigration Law Clinic has been co-counsel in the *Flores* settlement agreement since 2016. We were asked to join the *Flores* legal team because of our expertise in working with detained immigrants and unaccompanied minors. The Immigration Law Clinic at UC Davis was one of the first of its kind in the United States and it remains one of the only clinics in the country dedicated to representing detained immigrants before immigration courts and challenging conditions of confinement in federal court. We are also located in very close proximity to a secure facility for unaccompanied minors, the Yolo County Juvenile Detention Facility (one of only two secure facilities in the entire country), and have worked extensively with unaccompanied minors detained at the Yolo facility.

The history of the *Flores* settlement agreement is unique and uniquely important in the legal field. In the 1980's, Jenny Flores and other immigrant youth were detained by the Immigration and Naturalization Service, the precursor to the Department of Homeland Security. They were held in a dilapidated former motel complex that had been enclosed with a chain link fence. It was, at best, a makeshift facility. Though I was not around to see the facility where Jenny Flores was held, it is not difficult to imagine: the physical setting described is similar in many ways to the one I saw recently in Homestead, Florida. In Jenny's situation, however, the government made no provisions at all for the special needs of children in its care. Inside the fence, Jenny co-mingled with unrelated

adults, no special services were provided to meet her health or educational needs, and strip searches were regularly conducted. All of these practices were, simply put, not in the best interest of the child. Yet, there was also no legal instrument governing the conditions of their confinement.

When the *Flores* case settled 13 years later in 1997, the settlement agreement that was created began applying to children who are detained by the federal government. The agreement applied many principles of child welfare law to the treatment of immigrant children in the government's custody. Importantly, it created a sort of bill of rights for detained immigrant children so that no one would again be subject to the conditions to which Jenny Flores had been. The settlement was also an acknowledgement by the federal government, most recently re-stated last December by Lynn Johnson, Assistant Secretary for Health and Human Services' Administration for Children and Families that "children should be home with their parents" because "the government makes lousy parents."[1] In other words, the federal government has no experience or expertise in providing foster care. For this reason, the agreement established first and foremost, that children should be with their families, not held in custody. The agreement requires the government to release children without unnecessary delay to a sponsor, generally a family member, unless detention is necessary for the child's safety or to ensure their appearance at an immigration proceeding. For those children who are detained, the agreement requires that they be placed in facilities licensed by the state in which they are located, to provide congregate care for children. In addition, the facilities must meet a detailed set of requirements regarding the provision of health, mental health, educational and legal services. The only exception to these requirements, which we have heard repeatedly from the

---

[1] John Burnett, "Several Thousand Migrant Children in U.S. Custody Could Be Released Before Christmas" Dec. 18, 2018 available at https://www.npr.org/2018/12/18/677894942/several-thousand-migrant-children-in-u-s-custody-could-be-released-before-christ

Trump Administration, is a brief grace period when there is an emergency or influx of children exceeding the number of available licensed placements.[2] Importantly, however, the *Flores* Settlement Agreement contains no exception for government fabricated emergencies or self-created influxes.

As part of *Flores* counsel's legal team, we have been granted access to any and all facilities where children are detained. This is important because Congressional or media tours of detention facilities rarely reveal the full story. By speaking with the detained immigrant children, we uncover information that is not visible to the naked eye. As our co-counsel from the National Center for Youth Law, Leecia Welch, put it: "We see a very different picture. We see extremely traumatized children, some of whom sit across from us and can't stop crying over what they're experiencing."[3] This distinctive insight we obtain is the difference between believing a detention center is a "summer camp" and knowing that it is a house of horrors.[4] Throughout the course of these visits to facilities, we have uncovered numerous violations of the Flores Settlement Agreement through our countless conversations with detained immigrant children, which have led us to file several successful Motions to Enforce. Most recently, on July 30, 2018, Judge Dolly Gee in the Central District of California ordered the federal government to not medicate immigrant children in its care with psychotropic drugs without parental consent or a court order.[5] While these visits have long revealed issues with the implementation of *Flores*, in the Fall of 2017 we began to encounter

---

[2] *See* Exhibit 3 of the *Flores* Settlement Agreement, defining an emergency as "an act or event, such as a natural disaster…civil disturbance or medical emergency" and an influx as when the number of minors eligible for placement in licensed programs exceeds a certain number (which is to be determined each year).
[3] Leecia Welch, quoted by John Burnett, "Florida Shelter Is Scrutinized for the Way it Handles Migrant Children," February 13, 2019.
[4] Michael Garcia Bochenek, "US Family Detention Centers Not 'Like Summer Camp,'" August 1, 2018, Human Rights Watch.
[5] *Flores v. Sessions*, No. 2:85-cv-04544-DMG-AGR (C.D. Cal. July 30, 2018) (ECF No. 470), at 23-24.

a new phenomenon. The children we interviewed described policies and practices that prolonged their detention—everything from requiring a backup sponsor in case the original sponsor is deported, to requiring entire households of roommates with no connection to the child to be fingerprinted. As one child told us, "Who is the federal government to decide if my parent is good enough or not?" Decisions regarding the fitness of a sponsor are often made informally by case workers, or else require final ORR director approval—a lengthy bureaucratic process. The decisions themselves are based on misguided policies that have rapidly expanded the population of detained immigration children, swelling to a record 15,000 in late 2018, before a policy change only requiring the fingerprints of the sponsor and not everyone in the home resulted in more than 4,000 children being released from ORR custody within a span of four weeks – the largest decrease in the program's history. The change in policy also displayed a clear causal link to ORR policy: once fingerprints for every household member were no longer required, the Tornillo "influx" facility was no longer needed and promptly closed.

The results of these policies not only caused the growth of the detained population of unaccompanied minors, thereby self-creating an "emergency" or "influx," but they also prolonged the detention of immigrant children, in some cases for well over a year. Prolonged detention of children, as I'm sure the distinguished doctor of psychiatry on the panel with me today will explain better than I can, causes irreparable harm to the developing minds of children. For the unaccompanied minors that we speak with specifically, these are children that have suffered intense trauma and abuse either in their home countries, on the journey here, or both. This is a population that has much in common with the forced child soldiers of civil wars past and the federal government is responding to their PTSD with steel cages, causing them to act out until they

are detained under ever-harsher conditions, creating a continuum of trauma that these children are ill-equipped to endure.

One child told us she wanted to live with her sister. She said "I don't fully understand why ORR won't let me live with my sister, but I think it is because ORR thinks she doesn't have enough money. I would prefer to live with my sister or family over foster care, and I believe even poor families have the right to live together."

Another child told us he was waiting to be reunited with his mother. "My mom has done everything the government has asked her to do . . . . My case manager has told me that they are waiting on the fingerprints for my brother to clear because he lives with my mother. It has been a month since they had the fingerprinting done."

A mother told us that her son's caseworker "kept asking me for more and more documents: among them, files from doctors to verify that my cancer would not hinder me from taking care of my son. These . . . Caused me great sorrow, and they did not seem necessary to have my son. I believe that a mother has the right to take care of her child even though she is incapacitated, although I am not. It occurred to me that they were looking for an excuse to deny me my son."

Another mother said this about her daughter who was administered powerful psychotropic medication while in custody, without her mother's consent: "Since last year, when my daughter became a prisoner, I have noticed that she is more and more depressed . . . She tells me that she doesn't want to be in the detention center. When my daughter and I lived together in Honduras,

we never had mental problems. . . . In my opinion, detention is affecting her a lot, and she would quickly get better if they were to return her to me."

In addition to these examples, we heard from sponsors who were told that children will not be released to their care unless they comply with the following requirements: that they move to a different neighborhood, move to a larger apartment or house, reduce the total number of children living in their home, produce a photo establishing a prior relationship with the child (despite the fact that many families do not have access to this technology), and that they show they can afford the psychotropic medications that the government has prescribed. Each additional requirement moved the finish line for sponsor approval and family reunification, thus prolonging detention. There is also the Memorandum of Agreement between ICE, CBP and ORR which provides for the information collected by ORR on potential sponsors to be shared with ICE. This has had a chilling effect on sponsors and has serious consequences: I spoke with one youth detained at Homestead whose father was picked up by ICE shortly after being fingerprinted by ORR and whose detention was being prolonged by his father's own ICE detention. I cannot stress enough the courage and selflessness that it takes for an undocumented person to submit to fingerprinting under this administration.

Further, ORR "steps up" youth to more restrictive settings, from shelters to medium-secure, secure, and psychiatric facilities without the most rudimentary procedural fairness or transparency. Youth housed in shelters report being awakened in the small hours of the morning and soon thereafter finding themselves confined in juvenile halls or psychiatric facilities for months on end. Some are told they are being moved closer to their parents, only to be moved across the country in the

opposite direction. Once ORR steps up a youth to a residential treatment center ("RTC"), an RTC doctor must authorize release if they are "stable," certifying that they are not a danger to themselves or others. In effect, the act of summarily dispatching a child to a psychiatric facility converts immigration-related custody into indefinite commitment. The irony, of course, is that the child's mental distress is almost always due to their detention and separation from family, so that keeping them confined leads to further destabilization, perpetuating a circle of trauma that can take months and sometimes years to break.

Tornillo and likewise the Homestead facility are products of these policies that prolong detention, thereby manufacturing a "crisis." The steadily increasing numbers of detained youth have exceeded the supply of licensed child care facilities to care for them, despite the fact that there has not been an increase in the number of arriving unaccompanied minors. In response to its inability to release children to their family members, ORR has established unlicensed temporary influx shelters, first in Tornillo, Texas, and now in Homestead, Florida. These facilities have held thousands of children. At Homestead, for example, when I visited earlier this month, 1,600 immigrant children were housed there. The director of the facility told us that it had the capacity to hold 2,350 children, even though some rooms already held over two hundred children in the same room. Both Tornillo and Homestead are unlicensed facilities that do not meet the standards of care in the states where they are located, nor do they comply with the *Flores* agreement. This includes the failure to perform basic background checks on facility staff, much less the onerous scrutiny to which they have been subjecting would be sponsors.

These unmet standards are the minimum necessary to provide a safe and healthy environment for children in the government's care. But the harm to children first at Tornillo and now at Homestead goes further and includes the denial of basic freedoms and the human contact vital to developing children. The treatment of detained immigrant youth at these facilities is not an issue of immigration law and policy, but of human dignity. Deterrence by mistreatment should no longer be the leading immigration policy of this administration.

The children I interviewed at Homestead commented on their inability to have any freedom of movement. All youth, including 17-year-olds, have to get escorted to go to the bathroom. Youth move throughout the campus walking in single file military-style lines led by a youth care worker. A girl held at Tornillo told us "There are about 31 girls in the tent with me. There is no privacy. We aren't allowed to hug each other or touch in any way. Every day I feel sad. I don't have freedom to leave here. All I want is to be with my family." We heard a similar story from a girl at Homestead. She said "I also get huge headaches because I feel like I can't cry here. I wish I could cry here but I can't cry comfortably. I have to hold my tears because if not they send me to the clinician. I don't want to go to the clinician because they don't want to help my case. When the youth counselors see me sad, they talk to me and try to calm me down. But they are not allowed to hug me. I also want to try to hug my girlfriends when they are crying, but [staff] won't let me." I spoke with brothers who were separated at Homestead, one living on the North Campus for 17-year-olds and the other on the South Campus for 13-16 year-olds. They could visit each other only once a week for one hour and a half. Each told me how much they missed the other.

Previous court rulings interpreting the *Flores* settlement have set the grace period for detaining children in unlicensed facilities at 20 days. According to ORR, the average length of detention at homestead is 69 days. I spoke with multiple youth, however, that had been at homestead for much longer than three months, including several who had been detained for over 7 months. Unlike someone in the criminal justice system who will usually know the length of their sentence and can "do their time," immigrant children detained by ORR have been told they will be released in a week or two and that was three months ago.

Leaving aside the merits of describing an influx that has been happening at a consistent level for nearly five years as a temporary emergency, the harmful practice of detaining children in huge unlicensed facilities could be ended if ORR would simply abide by the *Flores* agreement and release children to sponsors without unnecessary delay. The constant calls to revoke the *Flores* agreement by those within the Trump Administration in order to "protect children" are misplaced and disingenuous. We would not tell a soldier in battle that they are safer without armor.

The *Flores* settlement agreement plays a critical role in protecting the safety and welfare of unaccompanied children in federal immigration custody. Compliance with the settlement has been an issue since its inception– and now the administration has indicated that it wants to get rid of the settlement entirely. While *Flores* counsel and other legal organizations will continue to investigate conditions of confinement and bring actions to enforce the letter and spirit of the *Flores* agreement, it is vital that Congress play its role to ensure that the government of the United States lives up to its legal and moral obligations to the children in its care.

Thank you.

# EXHIBIT I

McAllen, Texas, immigration processing center is largest in U.S.                    Page 1 of 3

# NEWS

TRUMP EFFECT

## McAllen, Texas, immigration processing center is largest in U.S.

NBC News was part of a group that went behind Ursula's highly secured doors to see firsthand what migrants go through before separations occur.



People who've been taken into custody related to cases of illegal entry into the U.S. sit in one of the cages at a facility in McAllen, Texas, on Sunday.   U.S. Customs and Border Protection

June 18, 2018, 6:38 AM EDT / Updated June 18, 2018, 9:19 AM EDT
**By Jacob Soboroff and Julia Ainsley**

McALLEN, Texas – Hundreds of young migrants are being kept behind metal wire – the type you'd see on a neighborhood batting cage or a dog kennel – inside the country's largest immigration processing center.

A Department of Homeland Security official called the facility, known as Ursula, the "epicenter" of the Trump administration's policy that has separated thousands of children from their parents.

A total of 1,174 children have been taken away from their mothers and fathers in the Border Patrol's South Texas Rio Grande Valley sector, with many brought to the Central Processing Station in McAllen, Texas, since the policy was announced on May 7, according to Manuel Padilla, the Border Patrol sector chief.

NBC News was part of a group that went behind Ursula's highly secured doors Sunday to see firsthand what migrants go through before separations occur.





**Inside a Texas border facility where kids and parents are being separated**
JUNE 18, 2018 02:51

The facility has spanned multiple presidential administrations but a new "zero tolerance" policy — which Trump's own top staff and Cabinet officials have <u>explicitly said is causing children to be taken from their parents</u> as part of an effort to deter border crossings — has turned the spotlight on it.

From Ursula, children will be sent to separate facilities run by the Department of Health and Human Services while their parents are sent to a detention center to await prosecution before a federal judge.

U.S. policy dictates that no one of any age should be kept in one of these processing centers longer than 72 hours. But because of the backlog at HHS centers for children, <u>hundreds of minors are forced to stay past that limit.</u>

As of Monday, the HHS had 11,785 minors in its custody, a department official told NBC News.

That number includes "all minors at all shelters and facilities in the unaccompanied alien children program," the official said.

Cameras were not permitted on the Father's Day tour, but the Border Patrol provided handout images of the stark situation: 1,129 migrants were detained in the 77,000-square-foot facility, nearly all of them behind the metal wire.

Mylar blankets, the type marathon runners wrap themselves in after finishing a race, covered the bodies of migrants throughout as they lay on mattresses atop concrete floors.

Migrants rest under mylar blankets at the Border Patrol's Central Processing Station in McAllen, Texas, on Sunday. This photo has been manipulated by authorities to protect identities.  U.S. Customs and Border Protection

In the 55,000-square-feet of the facility dedicated to families and unaccompanied minors, detainees were sorted based on age, gender and family status into what the Border Patrol called four pods: one for girls 17 and under, another for boys 17 and under, mothers with children and fathers with children.

Agents are overwhelmed. John Lopez, the deputy patrol agent in charge, told NBC News they lack manpower and the system is strained — and here, they're only separating less than half of the families so far.

Parents who are separated from their children aren't taken away until they are brought into processing to leave the facility — only at that moment do they find out if they'll be prosecuted, instead of taken to an ICE detention center with their children. They receive what is called a "tear sheet" informing them of their fate and how they might find their children again.



**Melania Trump, Laura Bush weigh in on President Trump's 'zero tolerance' immigration policy**
JUNE 18, 2018 03:02

For some, agents said, processing comes not with one of the 10 permanent processing agents but with virtual ones — video chats with agents in El Paso, En Centro or Corpus Christi — an effort to provide support for a system they say is understaffed.

Only four social workers were on hand to care for the hundreds of children, a backup system when Border Patrol agents are not prepared or qualified to deal with the challenges that come with caring for a child.

McAllen, Texas, immigration processing center is largest in U.S.                                    Page 3 of 3

**NEWS** ...ed with parents now find themselves alone in the facility before they are picked up and taken into the custody of the HHS, which cares for unaccompanied migrant children. Others arrived on their own.

Padilla, the Border Patrol chief, said agents in the Rio Grande Valley have allowed families with children under 5 to stay together in most cases.

An advocate who spent several hours in the facility Friday told The Associated Press she was deeply troubled by what she found.

Michelle Brané, director of migrant rights at the Women's Refugee Commission, met with a 16-year-old girl who had been taking care of a young girl for three days.

"She had to teach other kids in the cell to change her diaper," the AP quoted Brané as saying. "She was so traumatized that she wasn't talking. She was just curled up in a little ball."

A total of 1,129 migrants were detained in the 77,000-square-foot facility known as Ursula on Sunday.   U.S. Customs and Border Protection

Trump has repeatedly blamed Democrats opposed to his immigration reform proposal, falsely crediting an anti-trafficking law that passed unanimously in 2008 under President George W. Bush for the separations.

The detention of children apart from their parents is a result of the policy mandated by Attorney General Jeff Sessions, and there is no law that requires family separation. As such, congressional action is not necessary to stop it. Sessions has said the intent is to eventually prosecute everyone who crosses the border illegally.

Last week, Sessions gave a full-throated defense of the policy leading to family separations, saying having children does not give migrants immunity from prosecution and citing the Bible as justification.

"Noncitizens who cross our borders unlawfully, between our ports of entry, with children are not an exception," the attorney general said. "They are the ones who broke the law, they are the ones who endangered their own children on their trek."

*Jacob Soboroff reported from McAllen, Texas, and Julia Ainsley from Washington.*

Associated Press contributed.

# EXHIBIT J

# HHS.gov

U.S. Department of Health & Human Services

## Frequently Asked Questions Regarding Unaccompanied Alien Children

ACF's Office of Refugee Resettlement (ORR) in the U.S. Department of Health and Human Services provides funding and oversight to state-licensed shelters throughout the United States for children referred to ORR, by the Department of Homeland Security (DHS). These children are known as unaccompanied alien children (UAC). They include both children who enter the country without their parent or legal guardian and children who for other reasons have been separated from their parent or legal guardian.

In recent days, there has been a great deal of misinformation about the UAC program. This misinformation and the intentional perpetuation of it is a disservice to the hundreds of caseworkers and care providers who are deeply committed to the quality care and safe and speedy placement of the children with appropriate sponsors. Below are answers to frequently asked questions from community members and media regarding the UAC program.

Q: Why is HHS caring for children separated from their parents?

**A:** When a child who has entered the country illegally and is not accompanied by a parent or legal guardian, he or she is considered an unaccompanied alien child, and by law must be transferred to the Office of Refugee Resettlement for care and custody.

HHS is legally required to provide care for all children until they are released to a suitable sponsor, almost always a parent or close relative, while they await immigration proceedings. These children can also leave HHS care if they return to their home countries, achieve 18 years of age, or gain legal immigration status. The same procedure applies for children who have been separated from parents due to criminality or jeopardy, or when the parent is detained to await trial or convicted of a criminal offense and must serve time in federal custody.

Q: Is there a system for keeping parents and children connected if they are separated for immigration proceedings?

**A:** Yes. When adults and minors are apprehended by immigration authorities, their information is entered into government databases by which their cases can be tracked.

HHS has an electronic portal through which we track every child in our care - currently, more than 11,800 minors, including both children separated from their parents and those who arrived alone.

All minors in HHS care are assigned case managers. In the circumstance of children whose parents are in federal custody, the case managers are in contact with the parents' ICE case managers, ICE agents, and other federal law enforcement officials in order to verify their relationship and put the parents and children in communication. U.S. Public Health Service Commissioned Corps officers and other resource staff have been deployed to DHS facilities to assist parents in communicating with their children.

HHS has long provided resources for parents, including those in DHS custody, to communicate with their children in HHS care. Parents or guardians attempting to determine if their child is in HHS care should contact the ORR National Call Center at 1-800-203-7001, or via email at information@ORRNCC.com. Personal information will be collected and sent to the HHS-funded facility where the minor is located. The ORR National Call Center has numerous resources available for children, parents, guardians, and sponsors.

Q: Is HHS confident that this large number of children and parents, dispersed across the country, can be connected and reunited?

A: Yes. The UAC program has a wealth of experience in connecting the unaccompanied minors in its care to their parents and discharging them to parents, other family members, or other suitable sponsors since 2003, and has developed resources and systems for doing so. This has included communication and reunification with parents across the United States and around the world.

Q: What are the procedures for children separated from their parents to communicate with each other?

A: Within 24 hours of arrival, minors are given the opportunity to communicate with a verified parent, guardian or relative living in or outside the United States. Every effort is made to ensure minors can communicate (via telephone or video) at least twice per week. This communication is paid for by HHS.

Safety precautions are in place to ensure that an adult wishing to communicate with a minor is a family member or potential sponsor. Attorneys representing minors have unlimited telephone access and the minor may speak to other appropriate stakeholders, such as their consulate, case coordinator or child advocate.

Q: Do children in HHS care have access to lawyers?

A: Yes. HHS fulfills all requirements of the *Flores* settlement agreement and informs all minors of their rights by providing a Legal Resources Guide, Know Your Rights presentations, and HHS-funded legal services.

Q: How can very young children or children who are non-verbal be reunified with their parents?

A: This challenge is not new for ORR, which has worked since 2003 to discharge the unaccompanied alien children in its care to parents, other relatives or other suitable sponsors. ORR has procedures and systems for identifying the parents of very young children and children who are non-verbal.

Q: What kind of conditions do children in HHS-funded facilities experience?

A: UAC shelters provide housing, nutrition, physical and mental healthcare, educational services, and recreational activities such as television and sports. They provide an environment on par with facilities in the child welfare system that house American children.

The facilities are operated by nonprofit grantees that are certified by state authorities responsible for regulating such facilities housing children.



Q: What kind of access have the media been given to the HHS-funded facilities?

A: More than 50 separate media outlets have toured HHS-funded UAC facilities. There are restrictions on what kind of media coverage is possible, due to the need for privacy regarding children in our care.

HHS is committed to transparency around our work with children, and has also made available photos and video of facilities housing boys and girls taken recently and dating back to 2016, demonstrating continuity of care across administrations

Q: What kind of access have members of Congress and local officials been given to the HHS-funded facilities?

A: More than 70 members of Congress and more than 60 congressional staff members toured HHS-funded UAC facilities in June 2018. HHS is working with the relevant authorities in Congress to regularly schedule more tours, based on the availability of the facilities and prioritizing the safety and well-being of the children in our care.

Q: Where are HHS-funded UAC facilities located? Are there any near me?

A: HHS currently operates a network of more than 100 shelters in 17 states and has a proven track record of accountability and transparency for program operations, as well as being a good neighbor in the communities where shelters are located. HHS policy is to not publish or publicize the addresses of shelters to protect the privacy and security of the children and minimize disruption of the facilities.

Q: Does HHS have the capacity to care for an increasing number of children?

A: The UAC program has expanded and contracted over the years, driven by a variety of factors. It is designed to work in this way, and HHS has developed processes for bringing both permanent and semi-permanent UAC housing capacity online as needed.

HHS has a bed capacity framework with grant and contract mechanisms that allow for a sufficient base number of standard beds, with the ability to quickly add temporary beds, which provides the capability to accommodate changing flows.

HHS continues to update its bed capacity planning to account for the most recently available data, including information from interagency partners, to leverage available funds to be prepared for changing needs.

Given the numbers of unaccompanied alien children referred to its care since Oct. 1, 2017, HHS has increased the number of shelter beds from about 6,500 to about 13,000 beds. To build this capacity HHS re-opened a temporary emergency influx shelter for UAC in Homestead, Florida and established a new temporary emergency influx shelter in Tornillo, Texas.

Q: How are cheek swabs being performed?

**A:** ORR grantees are swabbing the cheeks of the children in ORR custody, while DHS personnel or field teams deployed by HHS are swabbing the cheeks of the purported parents in ICE custody. The cheek swabs are then sent to a third-party laboratory services provider to complete the DNA testing. The results are then transmitted electronically to the Incident Management Team at the Secretary's Operations Center (SOC), which shares them with the grantees. HHS will use the results only for verifying parentage.

Q: What happens to results after reunification?

**A:** HHS is using DNA testing – a practice normally used by ORR when regular documentation is not available – to expedite verification of parentage and comply with the court's artificial deadlines. A DNA test is done only when there is a specific purported parent-child relationship that needs to be validated. The DNA sample is only compared to the parent that is believed to be linked to the child. HHS has instructed the testing contractor to destroy both the DNA swabs and the results after verification is complete.

Q: Has ORR used DNA tests before?

**A:** Yes, it is done routinely in cases where verified documents are unavailable.

Q: Why doesn't HHS just quickly find family members, including parents, and immediately unify or re-unify?

**A:** We are determined to do everything we can to ensure we release children to safe and suitable sponsors with parents being the clear preference. To do so, we are working with other federal agencies to perform background checks on purported parents. HHS staff (federal field specialists on the ground) together with dedicated staff at grantees' shelters work hard to determine suitability and identity to help to improve the chances that the minors will be well-taken care of when they leave HHS care.

Q: How does HHS go about confirming the identity of parents, and were there adults in the past year who fraudulently claimed to be parents?

**A:** Reunification with most parents is in the best interest of the child, but proper and careful vetting for child safety is essential. Historically, HHS provided the care of a child in our custody and then performed criminal background checks on a sponsor and other adults in their household, ensured appropriate living arrangements, and confirmed the sponsor's ability to care for a child.

In light of the recent district court ruling, new efforts have had to be made to specifically determine whether a child was separated from a parent at the border and gather additional information about the purported parent.

Some parents have been found unsuitable for reunification because of issues discovered during a criminal background check, including child cruelty, child smuggling, narcotics crimes, robbery convictions, and a warrant for murder.

Q: How do ORR permanent shelters affect our community?

**A:** The impact on the local community is minimal. Shelters are operated by nonprofit organizations. About half of our shelters care for fewer than 50 unaccompanied alien children. These shelters are consistently quiet and good neighbors in the communities where they are located.

ORR pays for and provides all services for the children while they are in care at a shelter. This includes food, clothing, education, medical screening and any needed medical care to the children. Children spend fewer than 57 days on average at the shelters and do not integrate into the local community. They remain under staff supervision at all times.

Q: Do these children pose a health risk?

**A:** The Centers for Disease Control and Prevention believes that the children arriving at U.S. borders pose little risk of spreading infectious diseases to the general public.

Countries in Central America, where most of the unaccompanied alien children are from (Guatemala, El Salvador and Honduras), have childhood vaccination programs, and most children have received some childhood vaccines. However, they may not have received a few vaccines, such as chickenpox, influenza and pneumococcal vaccines. As a precaution, ORR is providing vaccinations to all children who do not have documentation of previous valid doses of vaccine.

Children receive an initial screening for visible and obvious health issues (for example: lice, rashes, diarrhea and cough) when they first arrive at Customs and Border Protection (CBP) facilities. Onsite medical staff are available at CBP facilities to provide support, and referrals are made to a local emergency room for additional care, if needed. Children must be considered "fit to travel" before they are moved from the border patrol station to an ORR shelter.

Children receive additional, more thorough medical screening and vaccinations at ORR shelter facilities. If children are found to have certain communicable diseases, they are separated from other children and treated as needed. The cost of medical care for the children while they are in ORR custody is paid by the federal government.

Q: Are communities safe with these kids in it? There are rumors that some kids are gang members.

**A:** Many of these children are fleeing violent situations in their home country and choose to leave rather than join a gang. They endure a long and dangerous journey to reach the border. When they are placed in a standard shelter, they are, as a rule, relieved to be in a safe and caring environment where they can wait for a sponsor to arrive to take custody.

ORR works in close coordination with local officials on security and safety of the children and the community. These children do not attend local schools while in ORR care. The impact of these shelters on the local community is minimal. Children spend 57 days on average at the shelters and do not integrate into the local community while in HHS custody. They remain under staff supervision at all times.

Q: How can individuals or communities help?

**A:** Members of the public have expressed interest in donating or volunteering to help unaccompanied alien children. The federal agencies supporting these facilities are unable to accept donations or volunteers to assist the unaccompanied children program.  However, there are several voluntary, community, faith-based, or international organizations assisting unaccompanied children. You can find resources and contacts in your state at the following online address: www.acf.hhs.gov/orr/state-programs-annual-overview

Q: How much does it cost to take care of the unaccompanied alien children?

**A:** The FY 18 appropriation for this program is $1.3 billion.

Q: Can I foster or adopt one or more of the unaccompanied alien children?

**A:** We have grantees in various parts of the United States who care for a small number of unaccompanied alien children in foster homes, and many providers are looking to expand their number of foster parents, particularly ones who are bilingual. ORR requires that all foster care parents be fully licensed by their state. If you are not already licensed, you could begin by contacting one of the foster care providers who care for unaccompanied alien children, such as the United States Conference of Catholic Bishops and the Lutheran Immigration and Refugee Service who have provided foster care to unaccompanied refugee and immigrant children for many years:

• Lutheran Immigration and Refugee Service LIRS) ✉

• United States Conference of Catholic Bishops (USCCB) ✉

Q: Are children who arrived as unaccompanied alien children ever enrolled in local schools?

**A:** ORR works in close coordination with local officials on security and safety of the children and the community. These children do not attend local schools while in ORR care. The impact of these shelters on the local community is minimal. Children spend 57 days on average at the shelters and do not integrate into the local community while in HHS custody. They remain under staff supervision at all times.

When UAC are released to an appropriate sponsor, while awaiting immigration proceedings, they have a right – just like other children living in their community – to enroll in local schools regardless of their or their sponsors' actual or perceived immigration or citizenship status. State laws also require children to attend school up to a certain age. A small number of children in HHS custody are placed in long-term foster care instead of being released to a sponsor. These children do enroll in public school in the community where their foster care is located. For more information about local educational agencies and unaccompanied alien children, please visit: www.ed.gov/unaccompaniedchildren.

## Prevention of Sexual Abuse Q&As

Q: What are the reporting requirements for care providers when they learn of an allegation of sexual abuse in their facility?

**A:** ORR has a zero-tolerance policy for all forms of sexual abuse and sexual harassment in all of its care provider facilities. Care providers must report sexual abuse, sexual harassment, or inappropriate sexual behavior that occur in ORR care immediately, but no later than four hours after learning of the allegation. Care providers report this information via a sexual abuse significant incident report (SIR). Care providers must follow state licensing requirements to report allegations of sexual harassment and inappropriate sexual behavior.

Care providers report allegations of sexual abuse to Child Protective Services (CPS), the state licensing agency, HHS/OIG, and the FBI. In the case of a sexual abuse allegation involving minors, CPS or state licensing may cross-report to local law enforcement. If an allegation involves an adult, the care provider must notify local law enforcement.

Q: How does ORR respond to an allegation of sexual abuse?

**A:** ORR reviews every report of sexual abuse submitted by care providers. When appropriate, ORR issues corrective actions or stops further placement of unaccompanied alien children (UAC) until the care provider addresses identified issues.

Additionally, ORR conducts monitoring activities of all care providers. ORR conducts desk monitoring and site visits routinely. ORR attempts to conduct a formal monitoring visit at least once a year. Most of ORR's care providers are state licensed and are therefore subject to monitoring by state licensing agencies.

Q: Does ORR have policies that specifically address sexual abuse?

**A:** Section 4 of the ORR Policy Guide implements ORR's Interim Final Rule (IFR). The Violence Against Women Reauthorization Act of 2013 contains a provision applying the Prison Rape Elimination Act (PREA) to custodial facilities operated by HHS. The IFR adopts the national standards set forth in PREA to prevent, detect and respond to sexual abuse and sexual harassment in ORR care provider facilities. The IFR was published on Dec. 24, 2014, with an implementation date of June 24, 2015.

Q: What if an allegation involves a staff member?

**A:** If a sexual abuse allegation involves a staff member, the care provider is required by the IFR to suspend the staff member from all duties that would provide the staff member with access to unaccompanied alien children pending investigation.

After investigation by an oversight entity, a care provider facility must take disciplinary action up to and including termination for violating ORR's or the care provider's sexual abuse-related policies and procedures. Termination must be the presumptive disciplinary sanction for staff who engaged in sexual abuse or sexual harassment.

Q: What does ORR do to avoid hiring staff who are at risk of committing sexual abuse?

**A:** ORR requires all care providers to hire staff who meet minimum requirements and qualifications. All care providers must complete a pre-employment background check on all potential staff, contractors and volunteers to ensure they are suitable to work with minors in a residential setting.

Care providers are prohibited from hiring or using the services of any applicant, contractor or volunteer who has engaged in, attempted to engage in, or has been civilly or administratively adjudicated to have engaged in sexual abuse, sexual harassment, or any type of inappropriate sexual behavior.

Q: What training do staff receive prior to working with youth in ORR care? Is it ongoing?

**A:** Staff must complete a number of trainings pre-employment. These trainings ensure that staff understand their obligations under ORR regulations and policies. Trainings include communicating with UAC, avoiding inappropriate relationships, reporting procedures, and sensitivity regarding trauma. Care providers must tailor trainings to the unique needs, attributes, and gender of the children at the individual care provider facility. Staff must complete refresher trainings every year or with any policy change. Additionally, ORR provides periodic trainings on topics related to preventing sexual abuse. ORR also conducts monthly calls to update care providers on issues.

Q: How can children and youth in ORR care report allegations of sexual abuse?

**A:** Children and youth in ORR care must have access and instructions on how to report sexual abuse, sexual harassment and inappropriate sexual behavior verbally and in writing to care provider staff, child protective services, the UAC Sexual Abuse Hotline, consular officials, and a local community service provider or national rape crisis hotline if a local provider is unavailable.

Q: How can parents, sponsors or other stakeholders report an incident of sexual abuse in ORR care?

**A:** Any child or third party, including family members, sponsors, legal service providers, or child advocates can report knowledge or suspicion of sexual abuse or sexual harassment at a care provider to the UAC Sexual Abuse Hotline.

The UAC Sexual Abuse Hotline is a toll-free number connected to live representatives, who are bilingual in English and Spanish, 24 hours a day/seven days a week. ORR will immediately notify the care provider, CPS, the state licensing agency, and/or the FBI and the OIG, as appropriate, of any allegations received directly from any child or third party. The care provider must immediately follow up to ensure all children and youth are safe and provided with appropriate services and that all required reports to ORR and outside entities are completed.

Q: How often does sexual abuse occur in ORR care?

**A:** Care providers report to the FBI any allegations of sexual abuse that are subject to federal reporting laws or could constitute violations of federal law. Sexual abuse is defined at 34 U.S.C. 20341 and in ORR regulations at 45 C.F.R. 411.6. Sexual abuse can include allegations such as touching of the buttocks or allegations of sexual assault, whether it was a minor-on-minor or staff-on-minor allegation. In FY 2017, care providers reported 264 allegations of sexual abuse to the FBI. Of those 264 allegations, 53 allegations involved an adult.

---

_ORR/ Division of Children Services/Unaccompanied Alien Children's Services program provides unaccompanied alien children (UAC) with a safe and appropriate environment as well as client-focused highest quality of care to maximize the children's opportunities for success both while in care, and upon discharge from the program to sponsors in the U.S. or return to home country._

---

Content created by Assistant Secretary for Public Affairs (ASPA)

Content last reviewed on August 7, 2018

# EXHIBIT K



CITY OF PHILADELPHIA
DEPARTMENT OF
LICENSES AND
INSPECTIONS

## INITIAL NOTICE OF VIOLATION AND ORDER

OYR REALTY GROUP
STONEHENGE ADVISORS INC
SUITE 400
1321 INTREPID AVE
PHILADELPHIA PA 19112

L&I Case Number:     671162
Date of Notice:   01/23/2019

**Property in Violation: 5201 OLD YORK RD**

Dear Sir/Madam,

On 01/22/2019 the Department of License and Inspections conducted an inspection/investigation of the above property and found it in violation of the Philadelphia Code. The results of the inspection are included in the violation section below. A re-inspection will be conducted on or about 02/26/2019 to determine compliance with this order.

If you have any questions regarding this notice please contact Inspector Martin Raudenbush (Martin.Raudenbush@phila.gov) or the District Office noted above.

### YOU ARE ORDERED TO CORRECT THE FOLLOWING VIOLATIONS PRIOR TO THE NEXT REINSPECTION DATE INCLUDED ON THIS NOTICE

**VIOLATIONS:**

A use registration permit is required for every new use commenced on any land or in any structure.  Return the subject premise to its approved usage or secure the proper permit for its present use. For zoning information call 215-686-2455.  (See A-301.1.5)
  Location: 5201 Old York Rd
  A new zoning permit is required for the intended Use of 5201 Old York Rd as a facility for unaccompanied children who are detained by Federal Governmant, its Office of Refugee Resettlement & its Contractors.

RIGHT TO APPEAL

You have the right to appeal these violations within thirty (30) days of the Date of this Notice or five (5) days for Unsafe or Imminently Dangerous violations. Appeals must be submitted in writing on approved forms to the Boards Administration Unit 11th floor Municipal Services Building 1401 John F Kennedy Blvd Philadelphia PA 19102.The appeal form can be downloaded from the L&I website at www.phila.gov/li. If you have any questions call (215) 686-2427.

PLEASE NOTE: TO APPEAL FIRE CODE VIOLATIONS ONLY, designated by an "F" prefix, you will need

1     of     2



CITY OF PHILADELPHIA
DEPARTMENT OF
LICENSES AND
INSPECTIONS

## INITIAL NOTICE OF VIOLATION AND ORDER

**L&i Case Number:      671162**

to file a FIRE CODE VIOLATION APPEAL with the Board of Safety and Fire Prevention.

The appeal form and directions can be downloaded from the Fire Department website by going to www.phila.gov/fire and clicking on FORMS.

### PENALTIES AND FEES

Fines shall be imposed from the date of this notice and shall be assessed in the amount of $150 to $2000 per violation each and every day the violation remains uncorrected.

Your failure to correct the violations may result in the revocation or suspension of certain licenses and permits. Your failure to correct the violations may also result in the City filing a legal action against you to obtain compliance, an injunction, and the imposition of fees and fines.

Failure to comply with the terms of this Notice will result in an automatic assessment of reinspection fees in accordance with Section 901 of the Philadelphia Administrative Code. $100.00 will be imposed on the second failed reinspection, $200.00 on the third failed reinspection, and $350.00 for the fourth and any subsequent failed inspections.

# EXHIBIT L

| City of Philadelphia Zoning Board of Adjustment  **Application for Appeal** CALENDAR # _____ (FOR OFFICE USE ONLY) | WHEN COMPLETED, MAIL TO: CITY OF PHILADELPHIA Department of Planning & Development Zoning Board of Adjustment One Parkway Building 1515 Arch St, 18th Floor Philadelphia, PA 19102 |

**APPLICANT MUST COMPLETE ALL INFORMATION BELOW. PRINT CLEARLY AND PROVIDE FULL DETAILS**

LOCATION OF PROPERTY (LEGAL ADDRESS)   5201 Old York Road

| ~~PROPERTY OWNER'S~~ NAME: Tenant: VisionQuest National, LTD PHONE #: 520-881-3950 E-MAIL: mark.contento@VQ.com | PROPERTY OWNER'S ADDRESS (INCLUDE CITY, STATE, AND ZIP) 600 N. Swan Road Tucson, AZ 85711 |

**A CORPORATION MUST BE REPRESENTED BY AN ATTORNEY LICENSED TO PRACTICE IN PENNSYLVANIA**

| APPLICANT: Joseph Beller, Esquire FIRM/COMPANY: Offit Kurman PHONE #: 267-338-1314 | APPLICANT'S ADDRESS (INCLUDE CITY, STATE, AND ZIP) 1801 Market Street, Suite 2300 Philadelphia, PA 19103 E-MAIL: jbeller@offitkurman.com |

RELATIONSHIP TO OWNER:  ○ TENANT/LESSEE  ⊗ ATTORNEY  ○ DESIGN PROFESSIONAL  ○ CONTRACTOR  ○ EXPEDITOR  ○ OTHER

APPEAL RELATED TO ZONING/USE REGISTRATION PERMIT APPLICATION # L&I Case #671162

IF A VARIANCE IS REQUESTED, PLEASE PROVIDE AN EXPLANATION OF EACH OF THE FOLLOWING CRITERIA AS REQUIRED FOR THE GRANTING OF A VARIANCE:

Does compliance with the requirements of the zoning code cause an unnecessary hardship due to the size, shape, contours or physical dimensions of your property? Did any action on your part cause or create the special conditions or circumstances? Explain.

This is an appeal of a Notice of Violation, not a request for a Variance. The use is in compliance with a previously issued Permit.

**RECEIVED**
**MAR 14 2019**
Board's Administration
Department of Licenses & Inspections

Will the variance you seek represent the least modification possible of the code provision to provide relief from the requirements of the zoning code? Explain.

N/A - No change in permitted use.

Will the variance you seek increase congestion in public streets or in any way endanger the public? Explain.

N/A - No change in permitted use.

Will the variance you seek substantially or permanently harm your neighbors' use of their properties or impair an adequate supply of light and air to those properties? Explain.

N/A - No change in permitted use.

Will the variance you seek substantially increase traffic congestion in public streets or place undue burden on water, sewer, school park or other public facilities? Explain.

N/A - No change in permitted use.

Will the variance you seek create environmental damage, pollution, erosion, or siltation, or increase the danger of flooding? Explain.

N/A - No change in permitted use.

REASONS FOR APPEAL:

The tenant is appealing Violation Number 671162 which states that a new use permit is required for every new use. The premises is not going to be operated in a manner any differently than the as allowed under the existing use permit. Specifically, in 2010 the ZBA issued a variance for the property to be used as group living. The use permit that was issued, Zoning Permit #254790, provided that the property could be used as follows: "...for diagnostic, treatment, educational and residential facility for 145 residents between the ages of 13 and 18." The tenant proposes to use the facility in the same manner for the same age group, but fewer children. This is not a new use.

Appeal filed with Board of License & Inspection Review on February 21, 2019 attached hereto and made a part hereof.

**RECEIVED**
**MAR 1 4 2019**
Board's Administration
Department of Licenses & Inspections

I hereby certify that the statements contained herein are true and correct to the best of my knowledge and belief. I understand that if I knowingly make any false statements herein I am subject to possible revocation of any licenses issued as result of my false application, and such other penalties as may be prescribed by law.

Applicant's Signature: _____   Date:  03   14   2019
Joseph Beller, Esquire                                    MONTH  DATE  YEAR

City of Philadelphia
Zoning Board of Adjustment
**Application for Appeal**

 **City of Philadelphia**

PROJECT INFORMATION FORM        RESULTS

# City of Philadelphia
# Project Information Form

## PIF Confirmation Page

Thank you for submitting your information. A copy of this information will be sent to your e-mail address. If you entered in any of this information incorrectly, please complete and **submit a new form** with the updated information.

NOTE TO APPLICANTS: You **MUST** print out your completed Project Information Form (PIF) and submit it to the Zoning Board of Adjustment (ZBA) with your appeal paperwork. Per Section §14-303 (15)(a)(.3)(.A) of the Philadelphia Code, "*an applicant who seeks either a special exception or a variance must submit to the Board, at the time the appeal is filed, a copy of the Project Information Form for such application, if the preparation of a Project Information Form is required for such application...*"

**View all projects** submissions.

**PRINT YOUR FORM**

### Applicant Information

#### Address of Development Project

5201 OLD YORK RD

#### Council District #

9

#### Name of Applicant

Joseph Beller

#### Zoning Application Number


RECEIVED

MAR 14 2019

Board's Administration
Department of Licenses & Inspections

671162

**Address of Applicant**

1801 Market Street
Suite 2300
Philadelphia, PA 19103

## Contact Information

**Is the contact person the same as applicant?**

- Yes

**Name of Contact Person**

Joseph Beller

**Phone Number of Contact Person**

(267) 338-1314

**Email Address of Contact Person**

jbeller@offitkurman.com

## Project Information

**Is your project exclusively residential?**

No

**Does your project result in a total of 2,500 square feet or more of floor area?**

No

## Sign & Submit

**Agreement:**

- I understand that all information submitted on this form is public information.

**Printed Name of Applicant**

Joseph Beller

**Please sign with the initials of the Applicant**



RECEIVED

MAR 1 4 2019

Board's Administration
Department of Licenses & Inspections

jb

**Date**

03/14/2109

Feedback

Terms of use    Right to know (pdf)    Privacy Policy





**City of Philadelphia**
**Board of License and Inspection Review**

1401 John F. Kennedy Blvd.
Municipal Services Building - 11th Floor
ATTN: Board of License and Inspection Review
Philadelphia, PA 19102

Date: _____

Appeal No: _____

## APPEAL

The undersigned has been aggrieved by action taken by the City of Philadelphia and hereby appeals to the Board of License and Inspection Review.

The action of the Department from which this appeal is taken:

Premises Cited: _____5201 Old York Road_____

Date of Violation/Refusal Notice: ___1-23-19___

Violation/Refusal Appealed: ___New Zoning Permit required___

The grounds for appeal are as follows: 1. The existing permit allows for the use contemplated.

2. The use has not commenced and therefore is not in violation.

_267-338-1314 (Attorney)_
Daytime Telephone Number

_215-802-7025 (Attorney)_
Evening Telephone Number

_jbeller@offitkurman.com_
E-mail Address

_267-338-1335_
Fax Number

_Vision Quest National, LTD_
Name of Appellant (PRINT CLEARLY)

_600 N. Swan Road_
Appellant's Address

_Tucson_          _AZ_          _85711_
City              State          ZIP

_Joseph Beller, Esquire_
Attorney (if any)

_1801 Market Street, Suite 2300_
Attorney's Address

_Philadelphia_          _PA_          _19103_
City              State          ZIP

_____
Signed (Appellant's Signature)
By signing above appellant certifies that the statements contained herein are true and correct to the best of the appellant's knowledge and belief.

RECEIVED
MAR 14 2019
Board's Administr...
Department of Licenses...

**PLEASE READ THE FOLLOWING CAREFULLY:**
Appeal must be signed by appellant or by attorney representing appellant. Representation by attorney is not required. Two (2) copies of appeal must be filed at the office of the Board, at the address given above, within thirty (30) days of the first notice of violation. Please attach two (2) copies of any notice or letter from which you are appealing. If you comply with the orders of the Department at any time after this application is filed, please notify the Board in writing at the above address.

81-186 (Rev. 06/13)



**CITY OF PHILADELPHIA
DEPARTMENT OF
LICENSES AND
INSPECTIONS**

## INITIAL NOTICE OF VIOLATION AND ORDER

| | L&I Case Number: | 671162 |
|---|---|---|
VISION QUEST NATIONAL LTD | Date of Notice: | 01/23/2019 |
600 N SWAN ROAD
TUSCON AZ 85711

**Property In Violation: 5201 OLD YORK RD**

Dear Sir/Madam,

On 01/22/2019 the Department of License and Inspections conducted an inspection/investigation of the above property and found it in violation of the Philadelphia Code. The results of the inspection are included in the violation section below. A re-inspection will be conducted on or about 02/26/2019 to determine compliance with this order.

If you have any questions regarding this notice please contact Inspector Martin Raudenbush (Martin.Raudenbush@phila.gov) or the District Office noted above.

### YOU ARE ORDERED TO CORRECT THE FOLLOWING VIOLATIONS PRIOR TO THE NEXT REINSPECTION DATE INCLUDED ON THIS NOTICE

**VIOLATIONS:**

A use registration permit is required for every new use commenced on any land or in any structure. Return the subject premise to its approved usage or secure the proper permit for its present use. For zoning information call 215-686-2455. (See A-301.1.5)
   Location: 5201 Old York Rd
A new zoning permit is required for the intended Use of 5201 Old York Rd as a facility for unaccompanied children who are detained by Federal Governmant, its Office of Refugee Resettlement & its Contractors.

**RIGHT TO APPEAL**

You have the right to appeal these violations within thirty (30) days of the Date of this Notice or five (5) days for Unsafe or Imminently Dangerous violations. Appeals must be submitted in writing on approved forms to the Boards Administration Unit 11th floor Municipal Services Building 1401 John F Kennedy Blvd Philadelphia PA 19102.The appeal form can be downloaded from the L&I website at www.phila.gov/li. If you have any questions call (215) 686-2427.

PLEASE NOTE: TO APPEAL FIRE CODE VIOLATIONS ONLY, designated by an "F" prefix, you will need to file a FIRE CODE VIOLATION APPEAL with the Board of Safety and Fire Prevention.



CITY OF PHILADELPHIA
DEPARTMENT OF
LICENSES AND
INSPECTIONS

## INITIAL NOTICE OF VIOLATION AND ORDER

**L&I Case Number:**          **671162**

The appeal form and directions can be downloaded from the Fire Department website by going to www.phila.gov/fire and clicking on FORMS.

## PENALTIES AND FEES

Fines shall be imposed from the date of this notice and shall be assessed in the amount of $150 to $2000 per violation each and every day the violation remains uncorrected.

Your failure to correct the violations may result in the revocation or suspension of certain licenses and permits. Your failure to correct the violations may also result in the City filing a legal action against you to obtain compliance, an injunction, and the imposition of fees and fines.

Failure to comply with the terms of this Notice will result in an automatic assessment of reinspection fees in accordance with Section 901 of the Philadelphia Administrative Code. $100.00 will be imposed on the second failed reinspection, $200.00 on the third failed reinspection, and $350.00 for the fourth and any subsequent failed inspections.

# EXHIBIT M



## Services at The Grace Dix Center

VisionQuest has a 45 year history of providing the highest quality services to youth involved in child welfare, juvenile justice and mental health care systems. VisionQuest has expertise in developing innovative programs for at-risk youth, including those designated for human trafficking, youth who require a high level of care, unaccompanied minors and refugee populations.

The VisionQuest Grace Dix Center offers residential services for Unaccompanied Children (UC) placed through the Office of Refugee Resettlement because the law states that youth who arrive in America alone (without guardians or parents) will not be deported. This program was created to provide support for the children and a safe place for them to live while they transition to permanent housing. This program supports children under the age of 18 who have come to America alone. This is not a part of President Trump's current immigration program which separates immigrant children from their parents and puts them in detention centers when they arrive in America.

We know that Philadelphia is a "sanctuary city" and that is just what this center is doing - providing sanctuary - a temporary living place and safe haven - for the children who would otherwise be homeless or in a shelter.  VisionQuest has been working with the city for over 35 years serving over 100,000 youth and still currently has other contracts with the city to provide services for youth. VisionQuest will provide temporary residential dormitory style housing for male children as staff work to identify sponsors and permanent residency opportunities for the children in our care.

**Youth will receive the following services while on campus:**

- **Classroom Education through ASPIRA Charter School**
- **Comprehensive Health Care**
- **Socialization and Recreation**
- **Mental Health Services through WES Health Systems**
- **Legal services through HIAS (Hebrew Immigrant Aid Society)**
- **In House Case Management Teams provide: Sponsorship Identification & Family Reunification Services**
- **In House Clinical Teams Provide:Trauma Focused- Cognitive Behavioral Therapy and Other Clinical Services**
- **Vocational Training**
- **Catered meals by Betty the Caterer Catering Company**

# EXHIBIT N



# Economic Impact Analysis:

## CITY OF PHILADELPHIA

MARCH 2019



VisionQuest



VISIONQUEST CONFIDENTIAL INFORMATION



GL⊖BAL

RESOURCE ADVISORS, LLC

# Introduction

Global Resource Advisors has been commissioned by Vision Quest do to an Economic Impact Analysis on its facility in Philadelphia, as well as the impact of its operations on the Commonwealth of Pennsylvania

The intent of this economic impact study is to showcase the direct and tangible positive economic impacts VisionQuest and its operations have made on the City of Philadelphia and the Commonwealth of Pennsylvania.

This analysis will include the benefit of VisionQuest Employment looking back over the last three years of legacy operations and looking forward to the planned impact of the new residential care facility through 2021.

The included economic impacts summarize the total money impact including direct investments and employment along with the indirect and induced benefits.

The I-RIMS (IMPLAN Regional Input-Output Modeling System) was selected as the standard methodology used for the modeling of direct indirect and induced benefits generated from the project.   This system was selected because of its basis in the RIMS II model produced by the Bureau of Economic Analysis.

VISIONQUEST CONFIDENTIAL INFORMATION

# Unemployment Rates

A perspective of the importance of local job creation.

| | |
|---|---|
| US | 3.8 % |
| Pennsylvania | 4.0 % |
| Philadelphia | 5.2 % |
| Zip Code 19141 | 14.7 % |

Data based on PA Department of Labor & Industry



GLOBAL RESOURCE ADVISORS, LLC

VISIONQUEST CONFIDENTIAL INFORMATION

# Philly Employment

A March 1 Wall Street Journal Article called Philadelphia one of the 10 coldest job markets in the country.

○ The Journal used a ranking system that takes five metrics into consideration in each of the 53 metropolitan areas with populations greater than one million in the US. These factors were: "Average unemployment rate in 2018; labor-force participation rate in 2018; the change in employment and change in labor force for the fourth quarter of 2018 from a year earlier; and the change in average weekly wage in the first half of 2018 from the first half (of) 2017,'.



GL🌐BAL
RESOURCE ADVISORS, LLC

# Scope of Project



GLOBAL RESOURCE ADVISORS, LLC

Facility size: 26,000 SF permitted with the City (leased) excluding school and gymnasium and outdoor yard area.

Projected Cost: **$5.6 million** per year (2019-2021)

Employment Created (2019-2021):

○ Professional/Management:
  ◦ 8 Full-Time Equivalents average salary $59,000

○ Skilled Labor:
  ◦ 101 Full-Time Equivalents average salary $32,000

Targeted start-up date: Spring 2019



VISIONQUEST CONFIDENTIAL INFORMATION

# Economic Impact



GLOBAL
RESOURCE ADVISORS, LLC

The economic impact includes direct, indirect and induced impacts on output (spending), earnings (income) and employment (jobs). The total numbers exclude the direct tax impact from the proposed facility outside of sales.

## Economic Impacts

| Total Money Impact 2016-2021 | Total Job Impact | Projected 2019-2021 Tax Revenue |
|---|---|---|
| $107,183,434 | 216 | $1,200,856 |

Source: IMPLAN (Regional Input-Output Modeling System) using estimates on the potential investment and employment in the Scope of Project



# Total Job Impact

The job impact is a measure of the total number of jobs created as a result of the project. Job creation reflects the direct employees hired to perform work within the facility, as well as the indirect and induced jobs that result from the wages and benefits paid to the direct employees, the annual purchases of goods and services, the investment in personal property and the investment in facilities.



Indirect / Induced Employees 103

Construction 6

Direct Employees 107

VISIONQUEST CONFIDENTIAL INFORMATION

# Estimated Tax Revenue



**GLOBAL**
RESOURCE ADVISORS, LLC

Tax revenue impact is determined by the annual revenue contribution to sales tax and property tax for all of the direct, indirect/induced and construction employees, as well as the Company's tax contributions for 2019 through 2021. The calculations are based on local and state tax rates and employee average annual income.



Income Tax Revenue, $271,541.52

Construction Tax, $20,831

Sales Tax Revenue, $138,582

Property Tax Revenue, $790,733

VISIONQUEST CONFIDENTIAL INFORMATION

# Total Money Impact

GL🜨BAL
RESOURCE ADVISORS, LLC

The total money impact of the project is a measure of the total capital circulation created by the operations and the new investment. Based on the data outlined in the Scope of Project, the total money impact of for years 2019 through 2021 is $62,802,011. It should also be noted that construction related to the project would add an additional $1,106,456.



2021
$21,974,117

2020
$21,974,117

Construction
$1,106,456

2019
$17,747,322

VISIONQUEST CONFIDENTIAL INFORMATION

# Investment in the Property

VisionQuest has invested in the property to carry out its mission to safely house, educate and care for minor youths.



GLOBAL
RESOURCE ADVISORS, LLC



Upgraded Hallways



Bedrooms



Lounge Area for Study/Relaxing

VISIONQUEST CONFIDENTIAL INFORMATION

# Investment in the Property



**New Showers**

**Upgraded Cafeteria**

**Computers for Every Student In the Classrooms**

**State of the Art Security**



**GL BAL**
RESOURCE ADVISORS, LLC

VISIONQUEST CONFIDENTIAL INFORMATION

# VisionQuest Impact

Total money impact to the City: **$107.1M**

Total number of jobs created: **216**

Total Direct Tax Impact: **$1.2M**

VisionQuest has invested in their facilities to provide upgraded and state of the art accommodations for Program Participants.

Their focus on education and ensuring migrant children have a safe and productive environment to prosper and integrate into the United States is indicative in the services and facilities they have upgraded.



GL☉BAL
RESOURCE ADVISORS, LLC

VISIONQUEST CONFIDENTIAL INFORMATION

# Sanctuary "Welcoming" City



**GLOBAL** RESOURCE ADVISORS, LLC

VisonQuest is contracted by Health and Human Services with no connection to any federal activity or agency in conflict with the Sanctuary City Policy

Opportunity for Philadelphia as a leader in the Sanctuary City movement to send a signal to the Federal Government that non detention based programs that are educating and giving skills to undocumented minors should be supported.

Mayor Jim Kenney *"Philadelphia is proud to be a city that welcomes all of those who seek safe haven"* in reference to the federal appeals court upholding the City's Immigration and Customs Enforcement policies on undocumented immigrants.

VISIONQUEST CONFIDENTIAL INFORMATION

# Conclusion

Contracted with the US Department of Health and Human Services Administration for Children and Families (ACF), Office of Refugee Resettlement (ORR), Division of Unaccompanied Children's Operations (DUCO) to provide housing and services to undocumented minors.

As a "Sanctuary City" Philadelphia has the opportunity to embrace the efforts of VisionQuest to provide housing and education services for minors.

In support of the federal contracts VisionQuest has brought, along with new community members, jobs, investment and tax revenue into the community.

This program brings significant job growth in an area of Philadelphia that has a significantly higher unemployment then the rest of PA



GL**O**BAL
RESOURCE ADVISORS, LLC

VISIONQUEST CONFIDENTIAL INFORMATION

# EXHIBIT O

# NOTICE OF DECISION

**City of Philadelphia**
ZONING BOARD OF ADJUSTMENT
One Parkway Building
1515 Arch Street - 18th Floor

APPLICATION #: VIOLATION 671162       DATE OF DECISION: 04/03/19       CAL #: 36782

ATTORNEY:   JOSEPH BELLER, ESQ.
            OFFIT KURMAN
            1801 MARKET ST SUITE 2300
            PHILADELPHIA PA 19103

APPLICANT:  JOSEPH BELLER, ESQ.
            OFFIT KURMAN
            1801 MARKET ST SUITE 2300
            PHILADELPHIA PA 19103

OWNER:      OYR REALTY PARTNERS LP
            STONEHENGE ADVISORS
            1321 INTREPID AVE SUITE 400
            PHILADELPHIA PA 19112

PREMISES:   5201 OLD YORK RD

# T H I S   I S   N O T   A   P E R M I T

The Zoning Board of Adjustment, having held a public hearing in the above numbered appeal,
after proper public notice thereof, has decided that the request for an APPEAL AGAINST L&I is:

## DENIED

ALL VARIANCES / CERTIFICATES / SPECIAL USE PERMITS GRANTED HEREIN ARE SUBJECT TO THE
FOLLOWING CONDITIONS:

1. **A PERMIT MUST BE OBTAINED FROM THE DEPARTMENT OF LICENSES AND INSPECTIONS,
   PUBLIC SERVICE CONCOURSE, 1401 J. F. K. BLVD., WITHIN THREE CALENDAR YEARS FROM THE
   DATE OF THIS DECISION.**
2. ALL CONSTRUCTION MUST BE IN ACCORDANCE WITH  PLANS APPROVED BY THE ZONING
   BOARD OF ADJUSTMENT.
3. A NEW APPLICATION AND NEW PUBLIC HEARING WILL BE REQUIRED FOR FAILURE TO COMPLY
   WITH THE FOREGOING CONDITIONS.
4. FURTHER CONDITIONS:

   **Appeal against L&I Denied**

By Order of the ZONING BOARD OF ADJUSTMENT
CAROL B. TIMARI, Sec.

NOTE:  All appeals from this decision are to be taken to the Court of Common Pleas of Philadelphia County within 30
       days from the date of this decision.

81-2000 (8/90)